837 A.2d 178

Murray J. MALIN

v.

Marcie Beth MININBERG.

No. 2520, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Dec. 1, 2003.

362

George Paxton (Lerch, Early & Brewer, Chartered, on brief), Bethesda, for appellant.

Bryan Renehan (Brodsky, Greenblatt & Renehan, Chartered, on brief), Gaithersburg, for appellee.

Argued before HOLLANDER, SHARER, WENNER, WILLIAM W. (Retired, Specially Assigned), JJ.

HOLLANDER, J.

This case presents a host of issues arising from the dissolution of the marriage of Murray J. Malin, appellant, and Marcie Beth Mininberg, appellee. Their union was brief; the parties married in November 1996 and separated in November 1999. The couple's only child, Samuel, was born on July 25, 1998.[1]

Appellee initiated divorce proceedings in June 2000, and the trial consumed five days in July 2001. At the end of trial, the court issued an oral opinion, which was followed by a written Opinion and Judgment of Absolute Divorce. The court's rulings spawned this appeal; Malin presents nine questions, which we have reordered slightly:

I. Did the court commit reversible error in finding that [the] husband was voluntarily impoverished?

---

1. Although custody was hotly contested at the outset of the divorce proceedings, the parties eventually reached a custody agreement that is reflected in a Consent Order of January 16, 2001. The parties share joint legal custody, and appellee has primary physical custody of Samuel.

II. Did the court err in setting child support at $1,500 per month?

III. Was it an abuse of discretion for the court to order [monthly] alimony in the amount of $3,500?

IV. Was it an abuse of discretion for the court's award of rehabilitative alimony to extend over five years?

V. Did the court exceed its authority in designating the wife's support payment as non-taxable alimony?

VI. Did the court exceed its authority in ordering the establishment of what amounts to be a trust account for future expenses of the parties' child?

VII. Did the court erroneously apportion between the parties the amount of money to be placed in a trust account for the expenses of the parties' child?

VIII. Was it an abuse of discretion for the court to decline to make a monetary award to husband?

IX. Was the award [to the wife] of $60,000 in attorney's fees an abuse of discretion?

For the reasons stated below, we shall affirm in part, reverse in part, and remand for further proceedings.

## FACTUAL BACKGROUND[2]

Appellant was born in 1958. At the time of the marriage, he was a thirty-eight year old practicing anesthesiologist. Appellee, born in 1969, was twenty-seven years of age when the parties married. Although appellee graduated from law school in 1994, she failed the Bar examination twice. Appellee decided not to take the exam for a third time because, after working for a general practice lawyer for about nine months, she realized that she "didn't enjoy the practice of law ... at all"; it was "too stressful...." When the parties met in late 1995, appellee was working at a jewelry store.

---

**2.** Because many pertinent events occurred at or about the same time, we shall generally present our summary by topic rather than by chronology.

In April 1996, the parties began to cohabitate at appellant's home in Bethesda. In the summer of 1996, appellee began working for her father, a physician, on a part-time basis. She was paid thirty dollars an hour to handle a variety of office and bookkeeping duties, earning about $1,800 biweekly.

Prior to the marriage, appellant disclosed to appellee his history of alcohol and drug addiction. Appellant first began abusing Valium during his residency at Georgetown University in 1987. That year, appellant spent two months at a treatment facility in Atlanta. Recognizing that he had a "real problem," and that it was a "life and death matter," appellant also sought treatment from an addictions doctor, became involved with Alcoholics Anonymous, and attended group therapy sessions. According to appellant, he remained sober from 1987 until 1999.

Prior to the marriage, Dr. Malin had already purchased a house in Bethesda, although he had little equity in it. The parties lived in appellant's home for approximately two years after they were married. Appellant also had furniture and an automobile. The parties sold appellant's furniture, netting approximately $23,000; the proceeds went into the "family coffers."

Dr. Malin accumulated $290,973.49 in retirement assets prior to the marriage. During the marriage, he made additional contributions of $54,358 to his retirement accounts. Dr. Malin also received $29,000 from the settlement of a boundary dispute relating to non-marital property, which the parties used for living expenses. Then, in January 1999, the parties received $73,418 from Guardian Life Insurance in connection with appellant's disability claim. According to appellee, these funds were also used for household expenses.

Appellee came to the marriage with $31,000 in a mutual fund, as well as a car and some jewelry. Her funds were used for family expenses. Moreover, for a period of approximately one year, while the parties' new home in Potomac was under construction, they lived with appellee's parents. According to appellee, by living with her parents for a year, they "saved a lot of money," which they used for their new home.

The parties settled on their new house in June 1999, just a few months before they separated. The purchase price was $782,581, plus settlement costs. In addition to a $60,000 deposit, the settlement sheet reflects that the parties borrowed $600,000 to fund the purchase, and paid another $145,000 at closing. The parties sold the house less than a year after settlement, in April 2000, for $975,000. The sale price included a built-in "high-definition" television that cost the parties about $13,000.

Apart from the mortgage, the funds used by the parties to acquire the marital home came largely from appellant's retirement account, most of which contained non-marital funds. It is undisputed that appellant withdrew about $200,000 from his various retirement account for that purpose. The parties used a portion of that money to pay fees and taxes generated by appellant's early withdrawal of his retirement funds.

Appellee testified that, during the marriage, she "was responsible for the house." Moreover, while they lived in appellant's home, the parties decided to renovate it, because it "needed a lot of repairs in order to be sold." Appellee testified:

... I was responsible for hiring all the contractors, overseeing the work, making sure it got done, meeting the contractors at the house.

I was responsible for all the grocery shopping, the dry cleaning, the upkeep of the house, making sure it was clean and everything was taken care of.

As noted, Samuel was born on July 25, 1998. According to appellee, he was a "very difficult" baby; he cried a lot, had colic, and "rarely slept." It is undisputed that Sam has serious developmental disabilities. He was diagnosed with "pervasive developmental disorder, not otherwise specified," an autism-related disorder characterized by lack of socialization and communication.[3]

---

3. The record is unclear as to whether Samuel was diagnosed in 1999 or 2000. See, e.g., E. 106 and E. 222.

Although appellee "worked until the day before [she] delivered," and went back to work "two weeks later," she decided in July 2000 to reduce her work schedule from thirty hours a week to fifteen, in order to devote more time to Sam's needs. Appellee explained that she did so because caring for Sam "became a full-time job just to explore programming, find programming, all the insurance and all the billing and the reading and the educating." Appellee also drives Sam to therapy sessions at least four times a week. Given her parental responsibilities and challenges, appellee added that it was "really hard" to "squeeze" in work. Further, appellee testified:

It's—it's—well, you first go through a process of just being completely overwhelmed, not knowing what to do, and you feel entirely inadequate as a parent, because you need to relearn how to be a parent.

You're not a parent in terms of what you normally just do with a child through the course of the day and they learn from just doing it. You have to learn how to teach them, how to be a parent. It's a totally different experience.

The parties hired a nanny in April 1999 to assist with Sam's care and with the household; the nanny continues to work for appellee. Appellee explained that she needs help with Sam because he cannot be left "unattended," even while appellee engages in simple tasks like showering. She stated: "[O]ne of the characteristics of children with these issues is they're unaware of danger...." In contrast to her friends, who "can leave their children ... sitting in a room while they do something else," appellee said that she "can't really do that with Sam."

Both parties attributed some of their marital difficulties to Sam's health problems. Appellee complained that she and the nanny "provided the primary care" for Sam, while appellant offered little help in caring for him during the time that they lived with her parents. She testified:

[W]e now had an infant who never slept, and I would be up all night and need some relief. And in the morning he

would leave at 6:00–6:30 to go play golf, come home at 3 o'clock in the afternoon, and then want to sleep all afternoon because he was tired.

I had been up all night and hadn't gotten a break. And being with Sam during the day at this point was not easy. All he did was cry, and we rocked and we walked and we rocked and we walked. And it was a very trying time.

Appellant acknowledged that his "relationship" with his wife became "more difficult" after Sam was born. He experienced "a constant struggle [with appellee] to be part of Sam's life," and complained that his wife frequently rejected his offers to help with Sam's care. According to Dr. Malin, during the latter part of the marriage, there was "no communication between the two of us," although he perceived himself as "very communicative." Moreover, he claimed that whenever he tried to "say anything," appellee "would yell or scream or get mad . . . ." It reached a point where he "didn't want to deal with it anymore."

In January 1998, appellant was terminated from his employment with Columbia Anesthesia Services, because he allegedly tampered with patient medical charts for financial gain. According to appellee, after appellant's termination she used her father's connections to help appellant find part-time work at various outpatient surgery centers.

Appellant relapsed in the spring of 1999, when he resumed his use of alcohol and drugs. Appellee described appellant's "behavior" at that time as "unbelievably erratic," and claimed that it "destroyed" their relationship. Characterizing appellant as "an absolute mess," appellee elaborated:

I never knew what would set him off. One day he would be nice. One day he would be very mean or nasty, and then the next morning I would get flowers.

And then a few days would go by, and I'd, you know, think that things were going to be okay, and then like a bomb would go off, and he would be nasty again, and then he'd call me nine times before 8 o'clock the next morning

from work to tell me how much he loved me and that I was the best wife.

\* \* \*

It made me sick to my stomach. We had just bought a new house. We had a new baby. You know, we had the makings of a wonderful life together.

And I didn't understand what I was doing that was so upsetting to him. I mean, I would even ask my father. I would tell him what happened, because I would cry at work.

And I would say, you know, "Dad, this is what happened last night. Please tell me what I did wrong so that I can understand it, because I don't understand it."

Appellee added:

I was walking on eggshells. I was—I never knew who was going to walk in the door. I didn't know if he was going to walk in and, you know, say "Hello. What do you want to do tonight," or if he was going to walk in and, you know, take out on me whatever had happened that was causing him to be so upset.

By October 1999, appellee "couldn't tolerate it anymore." She explained: "It was a miserable existence. We had no relationship. He was mean to me all of the time. It was just horrible. I cried all the time. It was a very unhappy place to be."

Dr. Malin acknowledged that his relapse in 1999 put a tremendous strain on his relationship with his wife. When asked if his "drug abuse had an adverse effect on [his] relationship with [his] wife," Dr. Malin replied: "Absolutely." He accepted "responsibility" for the pain that he caused his wife.

Appellant's relapse culminated in his arrest on November 3, 1999, "for writing a prescription using another doctor's name for a person that didn't exist." Appellee's father obtained counsel for appellant, and the charges were eventually placed on the stet docket, conditioned on appellant's commitment to undergo treatment. The following testimony is of interest:

[APPELLEE'S COUNSEL]: Now, when you were arrested, you lied to the police officer as to what happened; didn't you?

\* \* \*

[APPELLANT]: I'm going to take the Fifth Amendment. I was advised by an attorney, because of the status of my stet, that I really cannot answer any questions that have to do with that incident or before or me writing prescriptions. So, I'll take the Fifth.

Following appellant's arrest, he wrote a letter to his son. Dr. Malin disputed appellee's characterization of the letter as a suicide note. Appellant testified:

At that point I had felt that I was helpless and hopeless and there was nothing that could be done to make my life any better, and at that time I believe that Marcie would be—and Sam would be better if I wasn't in their life.

Which I realize, now is—because that's how I felt like I was such a burden on Marcie, and—and—and in the note was just "Yeah, I love my son and I hope that you're happy."

There was no intent of suicide. You know, you write your feelings.

Soon after his arrest, appellant began a twenty-eight day inpatient drug treatment program at Hazelden in Florida. Upon release, appellant participated in an outpatient drug program for five weeks and submitted to weekly drug testing for over a year. Appellant testified that he had not used any chemical substances or alcohol since November 1999. Moreover, he continues to attend Alcoholics Anonymous and participates in mental health counseling.

Appellant recalled his disappointment because appellee did not become involved in his treatment in Florida. According to appellant, appellee only visited him once during his in-patient stay, even though she was at her parent's Florida home, which was just an hour away. Indeed, while at Hazelden, appellant learned from his sister that appellee was leaving him.

Appellee left the marital home in November 1999, while appellant was at Hazelden. She, her son, and the nanny all moved to her parents' home, where they still resided as of trial. Appellee explained that she has remained in her parents' home because of the "[m]oney," stating: "I can't afford to live elsewhere." In addition, she believed any change in routine would have been detrimental to Sam. Although appellee hopes to move from her parents' home, she noted that a two-bedroom rental in the area would cost over $2,000 per month, compared to the $1,000 per month in rent that she pays her parents. Moreover, because of Sam's treatment, she wants to remain in the area.

Upon his return from Florida, appellant resided in the marital home, where he remained until it was sold in April 2000. He then moved to a town house that was purchased by his parents. Appellant paid the monthly mortgage payment of $2,250, and claimed total monthly expenses of $3,430 related to the town house. Additionally, appellant hired a live-in maid in June 2000, who was paid $1,300 a month through the time of trial.

The sale of the marital home yielded net proceeds of $297,451.06. The parties put $25,000 of that money into a "medical account" that they established at the bank for their son's needs. In addition, the parties each received approximately $10,000. The remainder of the money was deposited in a joint escrow account. It contained approximately $269,700 at the time of trial.

Appellant began to pay $1,000 per month in child support in January 2000. In February 2001, appellant began to pay appellee $2,000 a month in non-taxable alimony and $500 per month in child support. However, appellee complained that Dr. Malin was not always current on his payments.

The parties recognize that Sam's medical and other care is expensive, although they disagree about the costs. Sam is currently in the "START" program,[4] where he receives speech

---

4. START is an acronym for "Services Toward Autism Recovery in Toddlers."

and occupational therapy at a cost of $3,500 a month. Heidi Graff, the Administrative Director of the START program, testified that START provides an individualized, early childhood program specializing in helping toddlers to improve their sensory systems. Appellant acknowledged that the program costs $40,000 a year, but appellee maintained that Sam's total medical care and other services amounts to more than $60,000 annually. Appellee stated: "[Dr. Malin] and I will share the responsibility of that cost. . . . There's nothing more important right now than Sam getting the help that he needs. . . ." Appellee added: "Nobody can tell me how long Sam is going to need the START services." But, she claimed that Sam has made "amazing" progress, and the extent of his developmental delay has diminished somewhat.

Appellant has not worked as an anesthesiologist since he completed his last drug treatment program in 1999. He applied for a position as an anesthesiologist at Sibley Hospital, but "that job was lost as a result of [appellant's] drug use." He also applied to Georgetown for a pain management residency, but when the hospital learned of appellant's arrest, his application was terminated. According to appellant, that job "was not an option at that point."

Appellant eventually decided that it was not in his best interest to "practice anesthesia in the operating room" or to pursue any employment in the medical field. Consequently, he enrolled in business school at George Washington University, in an effort to secure an MBA degree. He said he planned to become a consultant in the field of "Data Mining," involving statistical informational modeling. The following testimony is relevant:

[ATTORNEY FOR APPELLANT]: Okay. And now since the time you went into [Hazelden] have you gone back to doing anesthesiology?

[APPELLANT]: No. I have not.

[ATTORNEY FOR APPELLANT]: Tell the Court about that. Is that a decision of yours?

[APPELLANT]: It was a decision of mine.

[ATTORNEY FOR APPELLANT]: Tell the Court.

[APPELLANT]: I had—when I was in [Hazelden]. There was [sic] many people, professionals, psychiatrists, psychologists, counselors.

My counselor advised me—he thought that it would be a big mistake to go back to anesthesia at all, and a couple of years prior to that I'd been advised by some psychiatrists that I'd been working with that they didn't feel that that would be the best thing for me to do, being a drug addict.

So when I returned back to D.C. I spoke with, Dr. Kolodner. I spoke with Dr. Allman who is my psychiatrist and people at [Hazelden] and Tony Banano, and I felt that that would not really be the interest of me to go back to anesthesia considering this relapse that I had recently undertaken. So I decided not to pursue that.

[ATTORNEY FOR APPELLANT]: And what have you—what did you do—was it your intention to be employed?

[APPELLANT]: Oh, yes.

[ATTORNEY FOR APPELLANT]: Tell the Court what it is you are doing now and what do you intend to do.

[APPELLANT]: Well I spoke with a lot of these same people and friends and felt that—considered law school, business school and for some reason I felt like I—I would pursue a business school career and—because I don't like sitting. I like doing things and working and so I applied and—some business schools and was excepted [sic] to some schools in town and—and enrolled at George Washington University full time last August, and I finished the first year and am taking a couple summer courses now too.

Appellant receives $10,000 a month in non-taxable disability benefits from three insurance policies. Although appellant owned these policies prior to the marriage, some of the premiums were paid during the marriage. Two of the policies permit appellant "to enjoy the benefits" so long as he is unable to "practice anesthesiology." The third policy pays no benefits if appellant does any kind of work. And, one policy has a five year limit.

As to the parties' employment opportunities, neither side presented expert testimony. With regard to appellant, appellee's lawyer observed during cross-examination that there was no "mention" in the Hazelden records suggesting that "it was not advisable" for appellant "to go back into medicine" or "practice medicine." The following testimony is also noteworthy:

[APPELLEE'S COUNSEL]: And despite the fact that you are only going to class for 11 credits from September of 2000 up until I guess May of this year [i.e., 2001], you didn't look for any work during that time, did you?

[APPELLANT]: Eleven is a full time load.

[APPELLEE'S COUNSEL]: Okay. Did you look for any part time work, Doctor, during that nine month period?

[APPELLANT]: No. No, I did not.

[APPELLEE'S COUNSEL]: You weren't going to school at all between December 1st, 1999, and September 1st, 2000, were you?

[APPELLANT]: No, I was not.

[APPELLEE'S COUNSEL]: And did you look for any part time work or any work at all during that time to help try to support your son?

[APPELLANT]: No, I didn't.

[APPELLEE'S COUNSEL]: You just relied on this $10,000 a month you were getting on the disability insurance, correct?

[APPELLANT]: I felt it was more important to get healthy and spend time with my son.

[APPELLEE'S COUNSEL]: Okay. There are a lot of things you could do with a medical degree other than practice anesthesiology in the operating room, isn't there?

[APPELLANT]: I'm sure there are.

[APPELLEE'S COUNSEL]: And you haven't looked into any of those, have you?

[APPELLANT]: I considered pain [management] and I considered doing psychiatry.

[APPELLEE'S COUNSEL]: And you considered those in December and January of 1999, 2000, but nothing since.

[APPELLANT]: That's correct.

[APPELLEE'S COUNSEL]: You could do insurance physicals and get paid piecemeal at the present time, couldn't you, Doctor?

[APPELLANT]: I guess I could do a lot of things.

During the separation, appellant "liquidated" his retirement accounts and "spent" over $200,000 of that money. In addition, appellant asserted that he borrowed $34,700 from his father after the separation to pay counsel fees, mortgage payments, alimony, and child support. He also acknowledged that he had received $180,000 in disability income during the separation. He conceded that "none of that money [was] left." Yet, appellant denied that he lived lavishly. When asked where his "money [has] gone," appellant noted that he also used some of the money to pay for business school. Further, he testified:

> From the time of marriage half—a significant and part of the money went into our home [new marital home], about half our—my retirement plan.

> The rest of it was spent this past year on medical expenses. Whether it was Hazleton [sic] or follow up other care. It's been a—legal bills.

> Significant legal bills, school, rent. I did buy a computer, a lap top computer and that was my lavish expense.

Copies of the parties' federal income tax returns were introduced in evidence. For 1996, the parties' joint return reflected $437,201 in total income, with an adjusted gross income of $396,765. Based on the statement of "Profit or Loss From Business," Dr. Malin received $421,841 in business income. According to the parties' joint 1997 federal tax return, they had $400,609 in total income and $361,563 in adjusted gross income. Dr. Malin reported net income of $372,688.

The parties filed separate returns in 1998. Appellee had wage income of $44,417 and an adjusted gross income of $44,428. Dr. Malin reported $73,234 in income and $62,200 in adjusted gross income. On her 1999 tax return, Ms. Malin reported wage income of $39,654 and an adjusted gross income of $40,709. Appellant's 1999 adjusted gross income increased to $311,029. In particular, Dr. Malin reported $105,434 in income and an IRA distribution of $224,000. For 2000, appellee's adjusted gross income increased to $51,919, because of a gain from the sale of the marital home. But, her wages decreased to $31,960. Dr. Malin's 2000 tax return was not introduced in evidence.

Appellee's 401(K), acquired during the marriage, was valued at $21,154. She also had $6,800 in jewelry; $2,000 in furniture; a 1999 Lincoln Navigator, valued at $27,900; a membership in Woodmont Country Club, valued at $22,000; and $7500 worth of china, silver, and crystal.

Appellant purchased a membership at the Robert Trent Jones Golf Club for $60,000 "in the year or so prior to the marriage." Despite only claiming to have played golf twice in the past two years, appellant incurred membership costs for the Club during the separation, paying $6,800 in 1999; $7,440 in 2000; and $8,800 in 2001. According to appellant, if he resigned from the club he might be entitled to a refund of about $36,000. Appellant also had a 1999 Ford Expedition worth $25,700; jewelry valued at $2,000; furniture valued at $10,000; and a Robert Trent Jones golf club bond, valued at $6,300, refundable without interest upon resignation from the club.

The parties incurred substantial debt for legal services and costs associated with this case; each party spent well over $100,000 in attorneys' fees. Appellant also incurred a tax obligation of more than $100,000 because of the liquidation of his retirement funds. Appellee sold her engagement ring for $31,000, and used the proceeds to hire a private investigator. Her father paid an additional $50,000 for the private investigator.

At the conclusion of the trial, the court rendered a comprehensive oral opinion, almost thirty pages in length, which was later embodied in a thorough written opinion. Among other things, the court granted appellee an absolute divorce on the ground of a one-year voluntary separation. Noting, *inter alia,* that the marriage "was short in duration," that "Dr. Malin was essentially the sole supporter of the family with his large salary," that appellee's non-monetary contributions were "priceless," and that appellant's conduct was the primary cause of the couple's "estrangement," the court awarded appellee rehabilitative monthly alimony of $3,500 for a period of five years, but denied her request for indefinite alimony. Among other things, the court said:

> Although Dr. Malin has depleted his retirement funds and other assets, he is still capable of producing a generous amount of income. He is currently receiving a large amount of disability payments, and I have already commented about the fact that he already has his credentials, and such credentials may be viewed as money in the bank for a person who can go out and practice his profession.

With regard to child support, the court found that Dr. Malin had voluntarily impoverished himself. It reviewed the "factors to be considered in determining whether a parent has become voluntarily impoverished ...," and concluded that Dr. Malin "is a very capable man, as he has indicated by his past performance what he is capable of doing earning—wise."

Although the court did not discredit appellant's testimony as to the advice he received about continuing his medical career, the court noted that he had not attempted to secure employment. It said:

> [I]t is not the role of this court to displace the advice [appellant] may have been given by any doctor that he may be seeing in this case. Now, I understand that he has earned and is receiving a substantial—what most would find substantial—disability payment, $10,000.00 per month, but I also understand from the testimony that he really hasn't

sought employment because he has chosen to enter graduate school and to prepare himself for other endeavors.

The court attributed $1,950 in monthly income to appellee based on her schedule of fifteen hours of work per week, and found that the parties had a combined monthly income in excess of $10,000. With regard to the matter of appellant's potential income, the court stated, in part:

Although Dr. Malin is suffering from an addiction, he has been able to attend school and is performing well in an MBA program. These courses are not easy. These studies are not easy, and even with the addiction treatment that he is going through, he has been able to do that.

He would be equally able to seek employment. He has made no efforts to continue the practice of medicine and even stated at one point that he wouldn't practice anesthesia anymore.

Now, don't be misled in suggesting that the Court is drawing any negative inference from the fact that Dr. Malin chose to remove himself from a situation in which probably every morning at the crack of dawn he would have in his hands some controlled substances that have been the cause of him having a problem, I understand that.

It is probably a very intelligence [sic] decision, but as I have said earlier, that is not the only thing he is capable of doing, and he has chosen not to work, to go back to school, and I recognize that that has played a large role in his decision not to practice anesthesia.

Nevertheless, the Court understands that there are many other options available to Dr. Malin in the field of medicine. His decision to change career paths was a voluntary decision.

It wasn't forced upon him. He chose to do that, and if you—if you make that decision, then the ramifications of that decisions [sic] when it comes to such things as your child support obligations, you must accept.

After careful consideration of the relevant case law and the statute, the Court finds that Dr. Malin, as I said, has voluntarily impoverished himself.

Accordingly, the court ordered appellant to pay $1,500 per month in child support. In reaching that decision, the court said:

I might also note parenthetically [appellant's] decision not to seek more gainful employment, on cross-examination it was not lost on the Court that questions were asked concerning whether or not you have even considered some part-time work, maybe not getting back—fully involved with the medical practice in some fashion on a full-time basis but maybe ... step-by-step or other things that you might be able to do perhaps administratively which don't even involve the actual touching of ... medication—of being present where medication is, and that decision hasn't been made.

Nevertheless, the Court finds as a matter of fact—and factored into the decision of child support and alimony, as well, that the decision was made to maintain membership at an exclusive Robert Trent Jones Golf Club.

It is not a criticism. It is an observation. It is a matter of fact. If you have child support and others [sic] which we will get to, those decisions certainly were factored into the Court's decision in this case.

In the context of it discussion of alimony, the court said:

The court finds that Dr. Malin has taken purposeful steps at decreasing his income and therefore finds [in regard to] the child support analysis ... that [Dr. Malin] has voluntarily impoverished himself.

Quite candidly, I was pleased to learn toward the end of the case—and it came out during cross-examination that Dr. Malin has not lost his license to practice medicine. This is very, very fortunate, and it is good.

He is still a physician, and I might add, a bright and able physician. The incidence of physicians who have problems with controlled dangerous substances [happen] because of a lot of reasons, perhaps the stress of a hard and difficult

occupation, perhaps the easy availability of substances to medical personnel, including doctors.

All of those factors probably weigh heavily into the fact that many people in the medical field end up with these kinds of problems, but it is not necessary nor do most of them just quit the business.

Dr. Malin being a bright young doctor could teach anesthesia. He could practice in other areas of medicine. There are a number of things with a person so credentialed that he could do.

Now, he has made the choice that he is not going to do those things. It is not a question of whether that choice is good or bad, right or wrong, but that choice as rendered— has put him in a position where, at first blush, it may seem that he is not able to satisfy the responsibilities that he will continue to have even after this divorce decree is signed.

There is no requirement that he not go to work. Now, ironically, I listened to this testimony in this case, and I did not hear the testimony that you typically hear.

I know sitting on the criminal side of the court, you see a lot of these cases where persons have this problem, and typically what you hear is that the patient had a ... surgical procedure, and while they were recovering the doctor prescribed certain medication to the person, which they became addicted to, and then they were unable to get off of the drug and it leads them down the road that Dr. Malin unfortunately took.

I didn't hear that in this case. I suspect if that testimony and evidence were available, I would have heard it. I am going to attempt to analyze why he has the problem.

I only make those comments so that Dr. Malin and Ms. Malin know that the Court has considered this—this issue and wrestled with this fact ad nauseam, and I find no reason why Dr. Malin can't be more ... gainfully [employed] because at the moment, other than a part-time job which yields no income, he is not employed and he may find that he will need to be.

Concerning Samuel's medical expenses, the court noted the "grave disparity" in estimates presented by appellant and appellee with regard to Samuel's care and expenses. Therefore, the court ordered the parties to place $60,000 from their marital home escrow account into a medical fund for the child, and ordered payment of "the therapeutic expenses for the child ... in proportion to the parties' income."

With regard to property distribution, the court noted that "the decision to award alimony and the decision to award a monetary award are inextricably connected." The court ordered the parties to divide equally "the proceeds from the sale of the house that was titled as tenants by the entirety and currently held in an escrow account," but declined to grant appellant a monetary award.

Thereafter, the court issued a Judgment of Absolute Divorce, dated July 24, 2001, which was docketed on August 2, 2001. The court also issued an eighteen-page written "Opinion," docketed on August 2, 2001, which was generally consistent with its oral ruling.

In its Opinion, the court carefully reviewed the statutory factors regarding alimony, set forth in Md.Code (1999 Repl. Vol., 2000 Supp.), Family Law Article ("F.L.") § 11 106(b). The court said, in part:

1) *The ability of the party seeking alimony to be wholly or partly self-supporting:* Mrs. Malin is a law school graduate not yet admitted to practice. Clearly, she is capable and has the great potential of being wholly self-supporting. Currently, however, the Court finds that she is not ready for that. She has been out of the job market deferring her career goals in order to be available for her husband and child. The decision to have her be a stay-at-home mom was a joint one.

2) *The time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment:* Mrs. Malin will need a reasonable period of time to re-enter the job market. If she chooses a legal career, it will not be a re-entry but an entry

as she has never practiced law before. She must sit for the bar exam and seek gainful employment.

3) *The standard of living that the parties established during their marriage:* The parties established a high standard of living. They have always lived under exclusive zip codes in Bethesda and Potomac. The taste in the finer things of life has not gone unsatisfied. The high life style was affordable for Dr. Malin whose salary approached $420,000/ year during the marriage. Mrs. Malin, on the other hand, has never made more than $30,000 a year.

4) *The duration of the marriage:* The parties may have only been married three years, but a full three years it has been. During those three years Dr. Malin was arrested and charged with obtaining a controlled dangerous substance by fraud. He went through drug rehabilitation and terminated his $420,000/year medical practice. The parties have also become parents of a lovely child who, unfortunately, has some therapeutic needs.

5) *The contributions, monetary and non-monetary, of each party to the well-being of the family:* Dr. Malin was essentially the sole supporter of the family with his large salary of approximately $420,000 per year. Mrs. Malin's non-monetary contributions have been priceless. She has been the primary caretaker of both the parties' son and Dr. Malin. It was Mrs. Malin who, with the help of her father Dr. Harvey Mininberg, orchestrated the retention of Barry Helfand, Esq., to get Dr. Malin out of jail. It was not lost on the Court that Dr. Malin was not charged for these services. Mrs. Malin cared for their son while Dr. Malin was in drug treatment. She arranged for their family, including Dr. Malin, to live with her parents while the parties' marital home was under construction.

6) *The circumstances that contributed to the estrangement of the parties:* It is abundantly clear that Dr. Malin's drug addiction, arrest, and treatment debilitated the parties' marriage like a "carcinogenic cell." The pain, mistrust, and disappointment became so acute as to have a terminal effect on this marriage. Mrs. Malin's contribution to the es-

trangement of the parties was benign, comparatively speaking . . . .

7) *The age of each party:* The relative age of the parties is of no real moment.

8) *The physical and mental condition of each party:* Dr. Malin has a substance abuse problem, has been involved in drug therapy, and continues to require AA meetings. Based upon Dr. Malin's conduct after his arrest and completion of therapy, an immediate and full recovery from his addiction is guarded. There is no issue with the physical and mental condition of Mrs. Malin. Her response to Dr. Malin's conduct is considered by the Court to be an appropriate one.

9) *The ability of the party from whom is sought to meet that party's needs while meeting the needs of the party seeking alimony:* Dr. Malin is clearly capable of making much more money than the $10,000/month that he now receives from his "disability" insurance. He has chosen to cease the practice of medicine and pursue his MBA. There was testimony that Dr. Malin said during an altercation between the parties, "I am not practicing anesthesia anymore [sic], you can divorce me if you want to." The Court finds that Dr. Malin has taken purposeful steps at decreasing his income, and therefore finds in the child support analysis that he has voluntarily impoverished himself. (Discussion follows)

10) *Any agreement between the parties:* In this case there was no agreement between the parties concerning alimony.

11) *The financial needs and financial resources of each party: (i) all income and assets, including property that does not produce income; (ii) any award made under §§ 8–205 and 8–208 of this article; (iii) the nature and amount of the financial obligations of each party:* Although Dr. Malin has depleted his retirement funds and other assets, he is still capable of producing a generous amount of income. He is currently receiving a large amount of disability payments each month. In addition, Dr. Malin still has his credentials.

12) The twelfth factor is not applicable in this case.

After careful consideration of the relevant case law and the statute, the Court awards rehabilitative alimony to the Plaintiff, Mrs. Malin, in the amount of $3,500 per month for a period of five years from the date of this order.

In reaching its decision to deny indefinite alimony, the court reasoned: "[T]he evidence is clear that [appellee] is capable of becoming self-supporting," but "it will take some time to reach this goal." The court added:

Mrs. Malin may never make enough income to enjoy the lifestyle that the parties enjoyed when married, but she will undoubtedly be able to make a decent living if she is given the time and tools to do so. Because of these reasons, the Court finds that an award of indefinite alimony would not be appropriate in this case.

In addition, the court's Judgment provided that the alimony payments will be "non-taxable" to appellee.

Further, the court found that, "for purposes of the child support analysis," Dr. Malin had "voluntarily impoverished himself." In reaching its decision as to voluntary impoverishment, the court wrote:

Factors to be considered in determining whether a parent has become voluntarily impoverished are as follows:

1. his or her physical condition;

2. his or her respective level of education;

3. the timing of any change in employment or financial circumstances relative to the divorce proceedings;

4. the relationship of the parties prior to the divorce proceedings;

5. his or her efforts to find and retain employment;

6. his or her efforts to secure retraining if that is needed;

7. whether he or she has ever withheld support;

8. his or her past work history;

9. the area in which the parties live and the status of the job market there; and

10. any other consideration presented by either party.

The court continued:

> Dr. Malin appears to be physically fit. He is clearly capable of being employed based on his credentials and education. He has chosen to enter graduate school and pursue other endeavors. Although Dr. Malin is suffering from an addiction, he has been able to attend school and is performing quite well in his MBA studies. He has made no efforts to continue the practice of medicine and even stated that he would not practice anesthesia anymore [sic]. The Court recognizes that Dr. Malin's addiction has played a large role in his decision not to practice anesthesia.

The court recognized that, because it found appellant voluntarily impoverished, it was required to ascertain his potential income. It said:

> Section 12–201(f) states further that, "potential income" means income attributed to a parent determined by the parent's employment potential and probable earnings level based on, but not limited to, recent work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community.

However, the court never imputed a particular income to appellant. It found that appellant receives $10,000 each month in disability payments; that appellee has a monthly income of about $1,950; and the parties' combined monthly income exceeds $10,000 per month. Because the parties' combined monthly income exceeded $10,000, the court recognized that it has "discretion ... to determine ... the level of child support." The court also said:

> After careful consideration of the relevant case law and statute, the Court finds that Dr. Malin has voluntarily impoverished himself. This determination is made in order that a record will be made of the Court's finding and analysis. The parties' income (even with Dr. Malin on disability) surpasses the guideline amount of $10,000 per month, therefore the finding of voluntary impoverishment

will play a de minimus role in the calculation of child support.

Noting that appellant continued to maintain his membership in a prestigious golf club, the court concluded that appellant had the means to support his child, and awarded monthly child support of $1,500. The court said:

> The Court finds that the Defendant shall pay to the Plaintiff the amount of $1,500 in child support per month. (It was not lost on the Court that Dr. Malin has continued his association with the Robert Trent Jones Golf Club during this litigation. If Dr. Malin has sufficient funds to belong to an extremely prestigious golf club, he certainly has the funds to support his child at the standard that the child would have maintained had the parties remained married.)

Pointing out that its "comments are not meant to be critical of Dr. Malin," the court said: "Nevertheless, the Court understands that there are many other options available to Dr. Malin in the field of medicine. His decision to change career paths was a voluntary decision."

As to Samuel's medical expenses, the court ruled:

> It was well established that the parties' child has considerable therapeutic needs. The plaintiff estimated on her financial statement that the child's expenses per year equal $62,363.49. On the other hand, the Defendant states in his financial statement that the child's therapeutic and school expenses total $40,000 per year. There is great disparity between these two figures. It was stated that the parties are hopeful that the child's therapeutic expenses will decrease as he gets older or that some of the costs will be defrayed by lesser expensive County options or insurance reimbursements.
>
> The Court finds that the most appropriate way to provides [sic] for the child's expenses is to have $60,000 from the ... Escrow Account [from the proceeds of the sale of the marital home] placed in the medical fund that was established for the child. [Appellee] will have control over

the account and disburse the funds accordingly. The Court finds that the therapeutic expenses for the child shall be paid in proportion to the parties' income. Currently, [appellant's] income is $10,000 per month and [appellee's] income is roughly $2,000 per month, for a total of $12,000 per month. [Appellee's] income is roughly 16% of the total income and [appellant's] income is roughly 84% of the parties' total income. [Appellee] therefore is responsible for depositing $9,600 in the medical fund and [appellant] is responsible for depositing $50,400 in the medical fund. The Court is unable to predict the therapeutic expenses of the minor child in the years to come. In this case, the Court finds that the parties shall continue to share these expenses on a percentage basis.

With respect to property distribution, the court observed that such awards are discretionary, and reviewed the three-step process that governs such awards. It valued the parties' escrow account, containing proceeds from the sale of the marital home, at $269,700. Further, it found that the account was "partially marital property and partially non-marital property." Although it recognized that appellant contributed over $230,000 of non-marital funds to acquire the marital home, the court said: "The parties are to split (50/50) the proceeds from the sale of the house that was titled as tenants by the entireties and is currently held in the escrow account."

The court also valued appellant's Oppenheimer SEP IRA at $4,920, and found that it was marital property; it found that appellant's 401K account was marital property, but accepted his claim that it had a value of zero; it found appellee's wedding ring was non-marital property; and determined that the $10,000 in monthly disability payments to Dr. Malin are non-marital property. In addition, the parties agreed that appellee's 401(K) was valued at $21,154.

After addressing the applicable statutory factors, the court declined to grant a monetary award to either party, finding that, "aside from the [marital home] Escrow account, there

are not sufficient assets remaining between the parties to provide a monetary award." Further, the court reasoned:

The Court considered the totality of the trial, the evidence submitted, and the testimony of the witnesses. In addition, the Court considered the fact that Dr. Malin has had $206,000 available to him since January 2000, in addition to the disability that he received monthly. Dr. Malin was unable to account for the majority of these funds. The Court considered that either all or a substantial amount of these funds have been dissipated.

After careful consideration of the statutory factors, the Court declines to grant a monetary award. The clear intent of the provisions governing disposition of property is to counterbalance unfairness that may result from the actual distribution of property acquired during the marriage strictly in accordance with its title.

Finally, the court noted the "contentious" nature of these kinds of cases and commended the attorneys for the quality of their work and their professionalism. It then ordered appellant to contribute $60,000 towards appellee's attorney's fees, which was promptly reduced to judgment.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Appellant contends that the court erred in finding that he was voluntarily impoverished. Moreover, appellant asserts that, even if the court correctly determined that he is voluntarily impoverished, the court erred by failing to impute potential income to him. Further, he complains that the court erred because it failed to impute additional income to appellee.

### A.

In essence, the court determined that appellant voluntarily impoverished himself because he chose to abandon his medical career and train, instead, for a career in business. The court

apparently considered it unreasonable for appellant to attempt to extricate himself from the field of medicine and its ready access to drugs, despite appellant's prolonged history of substance abuse, the court's recognition that appellant's chances for a complete recovery are "guarded," and appellant's receipt of $10,000 per month in tax-free disability insurance benefits. Rather, the court was of the view that appellant could find work in the medical field, more lucrative than the $120,000 he receives annually in non-taxable disability benefits.[5]

According to appellant, the evidence did not show that he deliberately intended to lose his job or to become dependent on drugs as a way to voluntarily impoverish himself. Rather, he asserts that, because he suffers from a substance abuse problem, it is not in his best interest to continue to practice medicine. Further, appellant complains that the court merely "surmised that there must be jobs available . . . in the medical field."

Dr. Malin also complains that the court used "inconsistent standards when judging the voluntary impoverishment of the parties." In his view, it is appellee who is voluntarily impoverished. He explains:

The court found that the Husband had voluntarily impoverished himself but failed to find that Wife had voluntarily impoverished herself. Wife was under no medical disability, Husband was. Wife was not fired from her job, but voluntarily cut her employment back from 30 hours a week to 15 hours a week. Husband was fired from his employment. Wife curtailed her employment, drastically reducing the hours she worked during this litigation. Husband lost his job before the parties separated. Wife did nothing to seek other employment. Husband sought other employment and was rejected as a result of his medical problems. Wife was not seeking retraining; she was fully trained as a lawyer, under no disability, but was refusing to work more than 15 hours a week. Husband was actively pursuing retraining

---

**5.** It goes without saying that $120,000 in non-taxable benefits is equivalent to a greater sum of taxable earnings.

for a career in another area, away from medicine and away from the temptations of mind-altering substances. What evidence there is in this case of voluntary impoverishment strongly suggests that it was Wife, rather than Husband, who was voluntarily impoverished.

Appellee counters that the court clearly considered the factors set out in *Goldberger v. Goldberger,* 96 Md.App. 313, 624 A.2d 1328, *cert. denied,* 332 Md. 453, 632 A.2d 150 (1993), to determine that appellant is, indeed, voluntarily impoverished for purposes of child support. Noting that appellant's decision was an exercise of "his own free will," she asserts: "The intent question is whether the parent or spouse intentionally became impoverished, for any reason, as opposed to whether the parent or spouse became impoverished with the intent of avoiding support payments."

■ "It is well established that parents have an obligation to support their children." *Durkee v. Durkee,* 144 Md.App. 161, 182, 797 A.2d 94, *cert. denied,* 370 Md. 269, 805 A.2d 266 (2002); *see Middleton v. Middleton,* 329 Md. 627, 633, 620 A.2d 1363 (1993); *Sczudlo v. Berry,* 129 Md.App. 529, 542, 743 A.2d 268 (1999). Thus, Title 12 of the Family Law Article ("F.L.") of the Maryland Code (1999 Repl.Vol.) provides a comprehensive scheme with regard to child support.

■ With regard to calculating child support, " 'a parent shall be considered "voluntarily impoverished" whenever the parent has made the free and conscious choice, not compelled by factors beyond his or her control, to render himself or herself without adequate resources.' " *Wills v. Jones,* 340 Md. 480, 494, 667 A.2d 331 (1995) (citation omitted); *see Petitto v. Petitto,* 147 Md.App. 280, 314, 808 A.2d 809 (2002); *Durkee,* 144 Md.App. at 182, 797 A.2d 94; *Digges v. Digges,* 126 Md.App. 361, 381, 730 A.2d 202, *cert. denied,* 356 Md. 17, 736 A.2d 1065 (1999). A parent is not excused from support because of a tolerance of or a desire for a frugal lifestyle. *See Moore v. Tseronis,* 106 Md.App. 275, 282, 664 A.2d 427 (1995). Indeed, the law requires a "parent to alter his or her ... lifestyle if necessary to enable the parent to meet his or her

support obligation." *Goldberger*, 96 Md.App. at 327, 624 A.2d 1328; *see Sczudlo*, 129 Md.App. at 542, 743 A.2d 268.

In analyzing the issue of voluntary impoverishment, the trial court *must* consider all of the "enumerated factors" in F.L. § 12–201(f). *Wills*, 340 Md. at 490, 667 A.2d 331. These include recent work history, occupational qualifications, and "prevailing job opportunities." *Id.* In addition, the court may consider other factors, including:

1. his or her current physical condition;

2. his or her respective level of education;

3. the timing of any change in employment or financial circumstances relative to the divorce proceedings;

4. the relationship of the parties prior to the divorce proceedings;

5. his or her efforts to find and retain employment;

6. his or her efforts to secure retraining if that is needed;

7. whether he or she has ever withheld support;

8. his or her past work history;

9. the area in which the parties live and the status of the job market there; and

10. any other considerations presented by either party.

*Goldberger*, 96 Md.App. at 327, 624 A.2d 1328 (citing *John O. v. Jane O.*, 90 Md.App. 406, 422, 601 A.2d 149 (1992)); *see Durkee*, 144 Md.App. at 183–84, 797 A.2d 94; *Wagner v. Wagner*, 109 Md.App. 1, 42–45, 674 A.2d 1, *cert. denied*, 343 Md. 334, 681 A.2d 69 (1996).

The seminal case of *Wills v. Jones, supra*, 340 Md. 480, 667 A.2d 331, is instructive. There, the Court of Appeals considered "whether penal incarceration constitutes a material change of circumstances sufficient to justify the modification of a child support award ... and whether an incarcerated parent should be considered voluntarily impoverished" under F.L. § 12–204(b). *Id.* at 483, 667 A.2d 331.

The Court explained that "voluntary" means that "the action [must] be both an exercise of unconstrained free will and

that the act be intentional." *Id.* at 495, 667 A.2d 331. The Court reasoned: "In determining whether a parent is voluntarily impoverished, the question is whether a parent's *impoverishment* is voluntary, not whether the parent has voluntarily avoided paying child support. The parent's intention regarding support payments, therefore, is irrelevant." *Id.* at 494, 667 A.2d 331. Therefore, the Court determined that "a prisoner's incarceration may constitute a material change of circumstance if the effect on the prisoner's ability to pay child support is sufficiently reduced due to incarceration." *Id.* at 483, 667 A.2d 331.

Of significance here, the Court in *Wills* indicated that, "[t]o determine whether a parent is voluntarily impoverished . . . a court must inquire as to the parent's motivations and intentions." *Id.* at 489, 667 A.2d 331. It concluded that an incarcerated parent cannot be deemed " 'voluntarily impoverished' unless he or she committed a crime with the intent of going to prison or otherwise becoming impoverished." *Id.* The Court said: "Our review of the language and legislative history of the child support guidelines leads us to conclude that the legislature intended that a parent's support obligation can only be based on potential income when the parent's impoverishment is intentional." *Id.* at 494, 667 A.2d 331.

The Court explained that a parent "is only 'voluntarily impoverished' as a result of incarceration if the crime leading to incarceration was committed with the intention of becoming incarcerated or otherwise impoverished." *Id.* at 497, 667 A.2d 331. It reasoned:

For an action to be "voluntary," we have consistently required that the action be both an exercise of unconstrained free will and that the act be intentional. . . .

We have addressed the question of "voluntariness" at length in the context of whether an employee left her past employment voluntarily, and therefore should be barred from collecting unemployment benefits. *Allen v. Core Target Y. Prog.,* 275 Md. 69, 338 A.2d 237 (1975). There, as here, the term "voluntarily" was not defined by the statute.

*Id.* at 77, 338 A.2d 237. After reviewing the common usage of "voluntary" as defined in a dictionary, we found that the phrase "due to leaving work voluntarily" has a plain, definite and sensible meaning, free of ambiguity; it expresses a clear legislative intent that to disqualify a claimant from benefits the evidence must establish that the claimant, by his or her own choice, intentionally, of his or her own free will, terminated the employment. *Id.* at 79, 338 A.2d 237. Following this definition, we found that an employee who had been discharged from her job because she was unable or unwilling to perform it properly could not be said to have left "voluntarily." *Id.* at 80, 338 A.2d 237. . . .

Our inquiry here is similar to that made in the unemployment context. In *Allen,* we noted that "if an employee is discharged for any reason, other than perhaps for the commission of an act which the employee knowingly intended to result in his discharge, it cannot be said that his or her unemployment was due to 'leaving work voluntarily.' " *Allen, supra,* 275 Md. at 79, 338 A.2d 237 (emphasis added). Thus, misconduct on the part of an employee is not sufficient to deem a subsequent termination of employment "voluntary" even if the employee's termination was a foreseeable result of the misconduct. *See id.* at 80, 338 A.2d 237. To determine whether [the father's] impoverishment is "voluntary," a court must similarly ask whether his current impoverishment is "by his . . . own choice, intentionally, of his . . . own free will." *Allen, supra* 275 Md. at 79, 338 A.2d 237. *The contention that [the father's] incarceration and subsequent impoverishment should be considered "voluntary" because he made the free and conscious choice to commit a crime stretches the meaning of the word beyond its acceptable boundaries. [The father's] incarceration can only be said to be "voluntary" if it was an intended result.* *Id.* at 495–96, 667 A.2d 331 (emphasis added).

*Stull v. Stull,* 144 Md.App. 237, 797 A.2d 809 (2002), is also noteworthy. There, the father had worked full-time as a general manager for a Pizza Hut and part-time for Blockbuster, earning a combined annual salary of approximately

$47,000. *Id.* at 245, 797 A.2d 809. However, he was terminated by Pizza Hut for falsifying documents and then lost his job with Blockbuster. *Id.* The father, who was denied unemployment insurance, submitted only one employment application in the four month period between the time he was fired and the trial. *Id.* The trial court concluded that he was voluntarily impoverished because his conduct had "caused [his] own discharge from work." *Id.* at 248, 797 A.2d 809. Therefore, it imputed income to him of $47,000, equal to his earnings when he was working both jobs, and ordered him to pay $712 in monthly child support.

Relying on *Wills v. Jones*, 340 Md. 480, 667 A.2d 331, the *Stull* Court reversed. We concluded that there was no evidence that the father's conduct, which culminated in his discharge, "was committed with the intention of becoming unemployed or otherwise impoverished." *Stull*, 144 Md.App. at 249, 797 A.2d 809. Holding that the father was not voluntarily impoverished, the Court said, *id.*:

The contention that the appellant's unemployment should be considered "voluntary" because he made the free and conscious choice to falsify records stretches the meaning of the word intentional beyond its acceptable boundaries. The appellant's unemployment can only be said to be "voluntary" if it was an intended result of his conduct.

This Court's decision in *Moore v. Tseronis, supra*, 106 Md.App. 275, 664 A.2d 427, also provides guidance. There, the appellant, a divorced father who worked as an auto mechanic, relocated from Baltimore City to Garrett County when he remarried, because his new wife wanted to return to the area where she grew up. Due to the difference in the economy, the appellant's earnings dropped substantially. Although appellant earned up to $37,491 while working in Baltimore City, his annual earnings plummeted to approximately $16,000 a year in Garrett County. *Id.* at 279–80, 664 A.2d 427. Therefore, he asked the court to reduce the amount of his child support obligation, which had been set at $600 per month. *Id.*

The master found that appellant had voluntarily impoverished himself, reasoning that the appellant had "knowingly and voluntarily elected a life-style that would make it difficult, if not impossible, to meet his support obligation." *Id.* at 280, 664 A.2d 427. The master then imputed $37,488 in income to appellant. *Id.* The circuit court affirmed. Concluding that the circuit court erred in finding that appellant was voluntarily impoverished, we reversed. *Id.* at 283, 664 A.2d 427. The Court explained:

We have no doubt that appellant's income would have been greater than it now is if he had not moved from Baltimore to a less affluent area. *We do not believe, however, that a court can restrict a parent's choice of residence in order to insure that he or she remains in or moves to the highest wage earning area. While a parent must take into consideration his or her child support obligation when making job and location choices, such considerations should not be immobilizing.* In the case *sub judice,* appellant's second wife always intended to return to her original home in Garrett County when she completed her education. *It certainly does not appear that appellant was attempting to shirk his child support obligations, only that he was attempting to move to a more rural environment* and to abide by his second wife's wishes. Indeed, the fact that when appellant first moved to Garrett County he took a job eighty miles form his home, commuting 160 miles each day to work as many hours as possible at the kind of job he was trained to do, hardly indicates an intention to impoverish himself or choose a life-style of ease or indolence.

*Id.* at 283–84, 664 A.2d 427 (emphasis added).

*Digges v. Digges,* 126 Md.App. 361, 730 A.2d 202, is also of interest. The father had enjoyed a successful and lucrative law career until he was convicted of mail fraud, incarcerated for a period of approximately two years, and disbarred. *Id.* at 365, 730 A.2d 202. Ms. Digges offered a vocational expert at trial, who testified as to the appellant's potential earnings. *Id.* Mr. Digges claimed that he was unable to obtain full-time

employment until he completed his master's degree in Business Administration. *Id.* at 366, 730 A.2d 202.

Initially, the trial court found that Mr. Digges was voluntarily impoverished and attributed potential income to him of at least $100,000. *Id.* at 368–69, 730 A.2d 202. In Mr. Digges's first appeal, we affirmed the trial court's ruling that appellant had voluntarily impoverished himself, but reversed the trial court's finding that the father had a potential income of $100,000. In reaching our conclusion as to voluntary impoverishment, we noted that appellant waited for more than a year after his release from prison to start a part-time graduate program and made little effort to secure employment. *Id.* at 370, 730 A.2d 202. We said, *id.* at 369–70, 730 A.2d 202:

[T]he evidence was sufficient to show that the primary cause of appellant's impoverishment was not his incarceration nor the loss of his law license but his total lack of interest or effort in attempting to find and secure regular, gainful employment.

In contrast, we noted a lack of evidence in the record as to what appellant could expect to earn on a regular basis. *Id.* Therefore, we remanded as to the matter of potential income and noted that, on remand, the trial court could receive additional evidence regarding the appellant's potential income. *Id.*

On remand, an expert in the field of vocational assessment and potential income testified on behalf of the wife. *Id.* at 372, 730 A.2d 202. The witness stated that appellant was best suited for a career in telecommunications consulting, and opined that appellant was capable of earning between $120,000 and $194,000. *Id.* at 372, 730 A.2d 202. In addition, the expert noted that appellant was capable of overcoming much of the stigma associated with his disbarment and conviction.

The trial court found that appellant still continued to resist finding full-time employment. Indeed, appellant had failed to prepare a curriculum vitae, fill out a single job application, or meet even the minimum course requirements towards his MBA degree. *Id.* at 375, 730 A.2d 202. The court then used

a progressive scale to attribute potential income to appellant, which was partly based on appellant's own admission that he expected to earn at least $50,000 in the upcoming year. *Id.* at 375–77, 730 A.2d 202. The court determined that appellant had the potential to earn $85,000 annually from October 1994 to October 1996, and as much as $150,000 from October 1998 to October 1999. *Id.* at 375–76, 730 A.2d 202.

Again, appellant appealed, and complained about the potential income attributed to him for purposes of child support and alimony. This time, however, we affirmed. We did so because the court's finding was *based on the evidence in the record.*

■ Guided by the above cases, we turn to consider the case *sub judice.* In our view, the court erred in concluding, on this record, that appellant was voluntarily impoverished.

Appellant's history with substance abuse is, unfortunately, a long one, dating to 1987, when he was a medical resident. Appellant testified that, after his relapse in 1999, he decided it was not in his interest to remain in medicine. Therefore, he decided to pursue a new career in business and enrolled as a full time student in graduate school. While doing so, he receives $10,000 of non-taxable income each month from his disability insurance policies.

In effect, the court regarded appellant as underemployed. Nevertheless, the court acknowledged that appellant is "suffering from an addiction," which "has played a large role in his decision not to practice anesthesi[ology]." Further, the court recognized that appellant's chances for an "immediate and full recovery from his addiction" are "guarded." Nevertheless, the court's finding of voluntary impoverishment was predicated on Dr. Malin's decision to abandon his career as a physician. In the court's view, Dr. Malin has many lucrative "options" available to him in medicine.

Significantly, there was not a shred of evidence that appellant gave up his medical career to avoid his duty of parental support. Appellant's relapse led to his conduct in falsifying a prescription, which then resulted in his arrest. While we do

not condone appellant's conduct, we agree with appellant that there was never any suggestion that he relapsed or committed a crime "with the intention of becoming incarcerated or otherwise impoverished." *Wills,* 340 Md. at 497, 667 A.2d 331; *see Stull,* 144 Md.App. at 249, 797 A.2d 809.

Appellant's criminal misconduct is certainly comparable to the conduct of the father in *Stull,* 144 Md.App. at 249, 797 A.2d 809. Yet, in that case, because the father had not engaged in such conduct with the deliberate intention of reducing his child support payments, we considered the conduct insufficient to support a finding of voluntary impoverishment. Indeed, we found that the notion of voluntary impoverishment in that situation unacceptably "stretches the meaning of the word intentional. . . ." *Id.*

Moreover, appellant's reason for seeking a new career path in business was at least as valid as the decision of the father in *Moore,* 106 Md.App. 275, 664 A.2d 427, who decided, for personal reasons, to relocate to a depressed economic area. In doing so, that father suffered a precipitous yet predictable decline in his income. Although we recognized there, as we do now, that a parent may not shirk his parental support obligation, we recognized in *Moore* that the father did not move in order to avoid paying child support. Significantly, we observed that there are limits on the extent to which a court can "immobiliz[e]" a parent, or "restrict" a parent's "choice of residence" and job preferences. *Id.* at 283, 664 A.2d 427.

Here, the court seemed to fault appellant for making a reasoned decision to extricate himself from a career in medicine, because the pressures of such work, coupled with the access to drugs that it affords, make the career detrimental to his health. Under these circumstances, where appellant had a legitimate ground to relinquish his medical career, and pursued retraining at a time when he could afford to do so because of his sizeable insurance benefits, we cannot sustain the court's finding of voluntary impoverishment. In effect, the court would consign appellant to a career in medicine, despite the potential adverse impact on his health and free-

dom, solely because a medical career *might* yield greater earnings. A decision on that basis is a short term answer to a long term problem; surely, it is not a solution.

To be sure, the parties were accustomed to a substantial income, and we do not demean the lifestyle that they were fortunate to enjoy as a result of appellant's career as a physician. But, it certainly is not in Sam's best interest for the court to place his father in a situation that might increase the prospect of a relapse. Moreover, in a free society, appellant should not be forced to maintain a particular career when there is a reasonable basis to believe that to do so would jeopardize his health or liberty; his current income is hardly insignificant; and the alternative career may yield a respectable income. Put another way, a parent's child support obligation should not be used to shackle the parent by preventing him or her from making a needed lifestyle change, based on valid reasons, particularly when, as here, the parent is able to provide reasonable child support.

As we noted, the court's decision was also founded on its belief that appellant has many career choices available to him in the field of medicine, and its assumption that a career in medicine would be more rewarding economically than a career in business. Yet, at trial, neither party presented any expert testimony as to appellant's employability in medicine or his potential income. As the Court in *Wills* made clear, the trial court must consider "prevailing job opportunities" in its analysis of voluntary impoverishment. 340 Md. at 490, 667 A.2d 331. Undoubtedly, appellant's opportunities for employment as a doctor have been adversely affected by his arrest and substance abuse problems. Indeed, the only evidence as to appellant's employment prospects revealed that he made two attempts to secure work as a physician, without success. This suggests that he may face serious obstacles in securing employment as a physician.

Despite the dearth of evidence in regard to appellant's employment prospects in medicine, or what earnings he could expect, the court found "that there are many options available to [appellant] in the field of medicine. His decision to change

career paths was a voluntary decision." We conclude that, in the absence of any evidence as to appellant's earnings potential in medicine, the court was not in a position to determine that he would earn more by remaining in medicine than from retraining for a career in business. To the contrary, the court engaged in conjecture when it found that appellant could obtain other medical jobs, and that such jobs would pay more than the $120,000 appellant was already receiving in nontaxable disability benefits.

Appellant's retraining may actually result in a more secure economic future for Samuel than would be obtained from appellant's employment in a low level medical position. Under the circumstances attendant here, it was to appellant's credit that he sought to pursue a new career at a time when he had a steady and significant income stream from his disability policies. In this regard, we pause to note that appellant testified that two of the policies provide a total of $6,000 in monthly benefits, but would lapse if appellant resumes work as an anesthesiologist. The other will lapse if appellant works in any capacity. And, one will lapse after five years.

Although the amount of child support that appellant was ordered to pay may well be reasonable under all the circumstances, we cannot sustain the award because the court erred in finding appellant voluntarily impoverished, and that finding was a consideration in the court's calculation of appellant's child support obligation. Under the Child Support Guidelines, F.L. § 12–204, when the parents have a combined income of $10,000 per month, the total support obligation for one child is $1,040 a month. Appellant was required to pay $1,500 per month based on the court's view that he is "clearly capable of making much more money" than $10,000 each month. Accordingly, we shall vacate the court's finding of voluntary impoverishment and remand for further proceedings.

### B.

Even if the court were correct in finding appellant voluntarily impoverished, a remand would still be required. We explain.

██ After the court makes a finding of voluntary impoverishment, the court must then make a determination of "potential income" to impute to the parent who has become voluntarily impoverished, in order to ascertain the appropriate level of child support. F.L. § 12–204(b). *See Wills,* 340 Md. at 490, 667 A.2d 331; *Petitto,* 147 Md.App. at 317, 808 A.2d 809; *Reuter v. Reuter,* 102 Md.App. 212, 221, 649 A.2d 24 (1994). The finding must be based on supporting evidence. *Long v. Long,* 141 Md.App. 341, 351–52, 785 A.2d 818 (2001).

██ Under F.L. § 12–201(f), "potential income" is defined as "income attributed to a parent determined by the parent's employment potential and probable earnings level based on, but not limited to, recent work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community." *See Dunlap v. Fiorenza,* 128 Md.App. 357, 365, 738 A.2d 312, *cert. denied,* 357 Md. 191, 742 A.2d 520 (1999); *Digges,* 126 Md.App. at 383–84, 730 A.2d 202; *Wagner,* 109 Md.App. at 42–43, 674 A.2d 1. In *Petitto,* 147 Md.App. 280, 808 A.2d 809, which involved the modification of child support, we identified several factors relevant to the court's determination of "potential income." They are, *id.* at 317–18, 808 A.2d 809:

1. age
2. mental and physical condition
3. assets
4. educational background, special training or skills
5. prior earnings
6. efforts to find and retain employment
7. the status of the job market in the area where the parent lives
8. actual income from any source
9. any other factor bearing on the parent's ability to obtain funds for child support.

██ Nevertheless, a parent's potential income "is not the type of fact which is capable of being 'verified,' through documentation or otherwise." *Reuter,* 102 Md.App. at 224,

649 A.2d 24. Indeed, "any determination of 'potential income' must necessarily involve a degree of speculation." *Id.* at 223, 649 A.2d 24. As long as the court's factual findings are not clearly erroneous, "the amount calculated is 'realistic', and the figure is not so unreasonably high or low as to amount to abuse of discretion, the court's ruling may not be disturbed." *Id.* (internal citation omitted); *see Petitto*, 147 Md.App. at 319, 808 A.2d 809; *Durkee*, 144 Md.App. at 187, 797 A.2d 94; *Goldberger*, 96 Md.App. at 327–28, 624 A.2d 1328.

Although the court acknowledged its obligation to make a finding of potential income, the court never actually attributed any potential income to appellant. *See Sczudlo*, 129 Md.App. at 542, 743 A.2d 268; *see also* F.L. § 12–201(b)(2). Instead, because this is an above Guidelines case, the court said its finding of voluntary impoverishment was a "de minimus [factor] in the calculation of child support."

## C.

We also agree with appellant that, on remand, the court should consider whether to impute additional income to appellee based on her work schedule of just fifteen hours a week. We explain.

In effect, the court's ruling amounted to an approval of appellee's decision in July 2000 to reduce her hours of work from thirty to fifteen per week. As we noted, appellee claimed that the reduction was necessitated by the demands of caring for the parties' disabled child.

Appellee described the challenges and difficulties that she experienced due to Sam's problems, which led her to reduce her work hours. But, some of the difficulties that she related are not necessarily of an ongoing nature. For example, appellee testified that she had to devote considerable time to learning about Sam's condition, finding suitable treatment programs, and dealing with health insurance matters. As of trial, appellee may have mastered the skills required to negotiate the hurdles of the medical and insurance bureaucracies.

And, at trial, appellee acknowledged that Sam had made "amazing" progress as a result of his treatment.

We recognize that a single mother with physical custody of a disabled child might find it difficult to work extensive hours or advance her own career while adequately meeting the child's needs. Accordingly, in a particular case, the court may, with good reason, determine that it is appropriate for a single parent to remain at home, or work part-time, or pursue a less lucrative career path, so that the parent can be available to meet the varying needs of a disabled child.

As best we can determine, however, the court did not determine that, because of Sam's condition, it was unreasonable to expect appellee to work more than fifteen hours per week. Indeed, in its related discussion of alimony, the court noted that appellee "will undoubtedly be able to make a decent living if she is given the time and tools to do so." Further, in regard to alimony, the court expressly found that appellee is "capable and has the great potential of being wholly self-supporting," but observed that "it will take some time [for appellee] to reach this goal." In this regard, it explained that appellee has been out of the job market for some time as a "stay-at-home mom," having "deferred" her career to care for Sam and appellant. It was also mindful that, "if she chooses a legal career, it will not be a re-entry but an entry, as she has never practiced law before." Noticeably absent, however, was any finding by the court that appellee cannot increase the hours in which she presently works outside the home because of Sam's health needs.

Appellee is fortunate to have stable child care to assist in Sam's care. Her health is "fine," according to her own testimony. As a relatively young, educated person with a law degree and suitable child care, appellee may well be in a position to increase her work hours beyond fifteen a week. Even if the court concluded that it is appropriate for appellee to work on a part-time basis, it is not clear why the court sanctioned employment of just fifteen hours per week. As the Court recognized in *Wills*, 340 Md. at 485, 667 A.2d 331,

"[b]ecause the parents' income levels determine the amount of support that a child receives, it is imperative to accurately assess the parents' respective incomes."

Therefore, on remand, the court should determine appellee's work capacity in light of her personal circumstances and the relevant statutory factors under F.L. § 12–201(f). If the court determines that appellee is able to increase her work hours, then it should impute income to her consistent with that determination, and calculate the parties' child support obligations accordingly.

For all these reasons, we shall vacate the award of child support and remand for further proceedings.

## II.

Dr. Malin advances several grounds to support his claim that the court erred in obligating him to pay child support of $1,500 per month. Given our decision to vacate the finding of voluntary impoverishment, the court must also reconsider the amount of appellant's child support obligation. Nevertheless, for the benefit of the court and the parties on remand, we shall briefly discuss one of appellant's contentions as to the amount of child support.

Appellant argues that the court erred in calculating his support obligation, because it failed to add court-ordered alimony to appellee's income and failed to deduct the alimony payments from appellant's income. We agree.

In 1989, the legislature enacted Maryland's Child Support Guidelines to comply with federal law. *Petrini v. Petrini,* 336 Md. 453, 460, 648 A.2d 1016 (1994); *Voishan v. Palma,* 327 Md. 318, 322, 609 A.2d 319 (1992); *Barton v. Hirshberg,* 137 Md.App. 1, 16, 767 A.2d 874 (2001); *Horsley v. Radisi,* 132 Md.App. 1, 21, 750 A.2d 692 (2000). Use of the Guidelines is mandatory unless, as here, the parents have a monthly combined adjusted income in excess of $10,000 per month. *See Wills,* 340 Md. at 484, 667 A.2d 331; *Voishan,* 327 Md. at 331–32, 609 A.2d 319; F.L. § 12–204(e).

■ An award of child support in an above Guidelines case will not be disturbed unless there is a "clear abuse of discretion." *Voishan,* 327 Md. at 331, 609 A.2d 319; *see Ware v. Ware,* 131 Md.App. 207, 240, 748 A.2d 1031 (2000); *see Chimes v. Michael,* 131 Md.App. 271, 288, 748 A.2d 1065, *cert. denied,* 359 Md. 334, 753 A.2d 1031 (2000); F.L. § 12–204(d) ("If the combined adjusted actual income exceeds the highest level specified in the schedule in subsection (e) of this section, the court may use its discretion in setting the amount of child support."). "The legislative history and case law do not obscure the fact that the Legislature left the task of awards above the guidelines to the chancellor precisely because such awards defied any simple mathematical solution." *Bagley v. Bagley,* 98 Md.App. 18, 39, 632 A.2d 229 (1993), *cert. denied,* 334 Md. 18, 637 A.2d 1191 (1994).

In *Voishan,* 327 Md. at 328, 609 A.2d 319 (citation omitted), the Court explained:

"[A]t very high income levels, the percentage of income expended on children may not necessarily continue to decline or even remain constant because of the multitude of different options for income expenditure available to the affluent. The legislative judgment was that at such high income levels judicial discretion is better suited than a fixed formula to implement the guidelines' underlying principle that a child's standard of living should be altered as little as possible by the dissolution of the family."

■ However, the trial court need not use a strict extrapolation method to determine support in an above Guidelines case. Rather, the court may employ any "rational method that promotes the general objectives of the child support Guidelines and considers the particular facts of the case before it." *Anderson v. Anderson,* 117 Md.App. 474, 478 n. 1, 700 A.2d 844 (1997), *vacated on other grounds,* 349 Md. 294, 708 A.2d 296 (1998).

Nevertheless, in above Guidelines cases, calling for the exercise of discretion, the rationale of the Guidelines still

applies. In *Smith v. Freeman*, 149 Md.App. 1, 19, 814 A.2d 65 (2002), this Court explained:

When the statute and case law speak of the inapplicability of the Guidelines to cases involving monthly parental income of more than $10,000, it is clear that they mean that the numerical component of the Guidelines does not apply. We underscore that, even in an above Guidelines case, "[t]he conceptual underpinning" of the Guidelines applies. As we said earlier, the Guidelines are founded on the premise "that a child should receive the same proportion of parental income, and thereby enjoy the standard of living, [that] he or she would have experienced had the child's parents remained together." That rationale is no less applicable here, merely because this is an above Guidelines case.

(Citations omitted).

Therefore, by analogy, we turn to the process of calculating support under the Guidelines. When calculating a parent's obligations pursuant to the Guidelines, the court must ascertain the parties' respective incomes. *See Harbom v. Harbom*, 134 Md.App. 430, 460, 760 A.2d 272 (2000); *Allred v. Allred*, 130 Md.App. 13, 18, 744 A.2d 70 (2000); *Reuter v. Reuter*, 102 Md.App. 212, 221, 649 A.2d 24 (1994); F.L. § 12–204(a)(1). *See also Drummond v. State*, 350 Md. 502, 512, 714 A.2d 163 (1998) (describing the process involved in calculating child support).

The schedule of basic child support obligations set forth in the Guidelines, F.L. § 12–204(e), is based on the combined adjusted actual income of both parents. *See* F.L. § 12–201(e) (defining combined adjusted actual income as "the combined monthly adjusted actual incomes of both parents"). Under F.L. § 12–201(b), income is defined as 1) actual income of a parent, if the parent is employed to full capacity; or 2) potential income of a parent, if the parent is voluntarily impoverished. *See Wagner*, 109 Md.App. at 42–43, 674 A.2d 1 (1996). Moreover, under § 12–201(c)(1)–(4), "actual income" is defined as "income from any source," and includes rent, salaries, wages, and gifts. Family Law § 12–201(d) defines

"Adjusted actual income" as actual income "minus" the (1) pre-existing child support obligations that are actually paid, (2) alimony or maintenance obligations that are actually paid, and (3) the actual cost of health insurance coverage that is provided to the child or children when the parents are jointly or severally responsible for providing such coverage. F.L. § 12–204(a)(2)(ii) is also relevant. It states:

> (ii) If the court awards alimony or maintenance, the amount of alimony or maintenance awarded shall be considered actual income for the recipient of the alimony or maintenance and shall be subtracted from the income of the payor of the alimony or maintenance under § 12–201(d)(2) of this subtitle before the court determines the amount of a child support award.

Although the Guidelines do not apply here, "the conceptual underpinning" does apply. *Freeman*, 149 Md.App. at 19, 814 A.2d 65. Therefore, the trial court erred in the way it calculated appellant's support obligation, because it failed to consider the alimony payments. The court determined that appellee earns $1,950 per month, based on her part-time employment in her father's medical office. It also found that appellant receives $10,000 per month in insurance benefits. Yet, the court failed to consider appellee's alimony award as part of appellee's income for purposes of determining her share of the child support. In the same way, the court also failed to subtract from appellant's income the alimony he was required to pay to appellee.

Accordingly, on remand, the court should consider any alimony award to appellee as part of her income, while reducing appellant's income by the amount of such alimony payment. In this way, the court will be in a position to determine the parties' proportional shares of the child support obligation that it considers appropriate.[6]

---

**6.** We observe that, if the parties have a combined income of $12,000, and appellee's income were calculated to include receipt of alimony, while appellant's income were adjusted to reflect payment of alimony,

### III. and IV.

Appellant argues that the court erred or abused its discretion in awarding appellee $3,500 per month in rehabilitative alimony for a period of five years. Because the parties were only married for three years before they separated, appellant contends that the court should not have awarded alimony for a duration that exceeded the length of the marriage. He also challenges the amount of the alimony award.

Appellant makes much of the fact that appellee is not making use of her educational background. As he points out, appellee is "very well educated, with marketable job skills, no health problems and no need for retraining." Claiming that appellee is "under-employed," appellant asserts: "It was error for the Court to order rehabilitative alimony for a five-year period, as [appellee] was doing nothing to rehabilitate herself or develop a career" and "did not demonstrate any need for rehabilitation." Moreover, in appellant's view, the court "totally ignore[d][the] wife's young age, her educational accomplishments and her present income earning potential." Thus, he asserts: "Even if [appellee] needed six months or a year to study or retake the bar exam, to allow [appellee] five years of alimony does nothing but reward her inactivity and her unwillingness to be employed to capacity...." Dr. Malin suggests that, "at the most," appellee should have received eighteen months of alimony.

Further, appellant contends that the court "did not properly calculate [appellee's] income earning capacity" in its determination as to the amount of alimony. In this regard, he complains that the court "merely attributed" $2,000 per month in income to the wife, based on her voluntary decision to work approximately fifteen hours per week for her father. Appellant maintains that, "[a]s a precondition to awarding alimony, a court must make specific findings of fact regarding the income and need of the spouse seeking alimony." Further, he

he would have monthly earnings of $6,500 (54.2%), while appellee would have income of $5,500 (45.8%).

states: "Given Wife's educational background and her prior work history, it was error for the court not to properly calculate Wife's potential income and attribute additional earnings to her."

Appellee counters that the court is vested with wide discretion in determining the amount and duration of alimony. She insists that the court was "not limited" by the length of the marriage in making its alimony award, as "the duration of the marriage is only one of many factors that go into determining the amount of alimony." Appellee adds that, as the court recognized, "the parties' child has special needs" that require her to expend considerable time on his behalf. Therefore, five years of alimony "allows her reasonable time to get the child into school and into proper placement before turning her efforts to full time employment."

In addition, appellee claims that the court was not required to make specific findings of fact as long as it considered the requisite statutory factors. In this regard, she notes that, "in both its oral and written opinion, [the court] set forth and made findings as to each factor." Moreover, appellee points out that Dr. Malin offered no expert testimony to establish how much money appellee could expect to earn as a practicing lawyer.

In regard to alimony, "the paramount goal of the legislature was to create a statutory mechanism leading to equitably sound alimony determinations by judges." *Tracey v. Tracey,* 328 Md. 380, 388, 614 A.2d 590 (1992). As we stated in *Blaine v. Blaine,* 97 Md.App. 689, 699, 632 A.2d 191 (1993), *aff'd,* 336 Md. 49, 646 A.2d 413 (1994): "The statutory scheme of the current alimony law provides trial court judges with a great deal of liberty to weigh the relevant factors and arrive at fair and appropriate results." Moreover, each case depends on its own circumstances. *Turner v. Turner,* 147 Md.App. 350, 387, 809 A.2d 18 (2002).

When reviewing a trial court's award as to alimony, an appellate court will not reverse the judgment unless it concludes that "the trial court abused its discretion or ren-

dered a judgment that was clearly wrong." *Crabill v. Crabill,* 119 Md.App. 249, 260, 704 A.2d 532 (1998). Moreover, "appellate courts will accord great deference to the findings and judgments of trial judges, sitting in their equitable capacity, when conducting divorce proceedings." *Tracey,* 328 Md. at 385, 614 A.2d 590. *See also Durkee,* 144 Md.App. at 173, 797 A.2d 94; *Caccamise v. Caccamise,* 130 Md.App. 505, 513, 747 A.2d 221 ("The standard of review for alimony awards is the clearly erroneous standard . . . ."), *cert. denied,* 359 Md. 29, 753 A.2d 2 (2000); *Digges,* 126 Md.App. at 386, 730 A.2d 202. As long as the trial court's findings of fact are not clearly erroneous and the ultimate decision is not arbitrary, we will affirm it, even if we might have reached a different result. *Reese v. Huebschman,* 50 Md.App. 709, 712, 440 A.2d 1109 (1982).

 Alimony is governed by Title 11 of the Family Law Article. Collectively, these provisions enable the trial court to ensure " 'an appropriate degree of spousal support . . . after the dissolution of a marriage.' " *Innerbichler v. Innerbichler,* 132 Md.App. 207, 246, 752 A.2d 291 (quoting *Tracey,* 328 Md. at 388, 614 A.2d 590), *cert. denied,* 361 Md. 232, 760 A.2d 1107 (2000). As the Court of Appeals made clear in *Tracey,* 328 Md. at 391, 614 A.2d 590, the "purpose of alimony is not to provide a lifetime pension, but where practicable to ease the transition for the parties from the joint married state to their new status as single people living apart and independently." The Court explained:

> [A]limony's purpose is to provide an opportunity for the recipient spouse to become self-supporting. The concept of alimony as life-long support enabling the dependent spouse to maintain an accustomed standard of living has largely been superseded by the view that the dependent spouse should be required to become self-supporting, even though that might result in a reduced standard of living.

*Id.* (citations and quotations omitted).

 Thus, "Maryland's statutory scheme favors fixed-term, 'rehabilitative' alimony rather than indefinite alimony."

*Innerbichler,* 132 Md.App. at 244, 752 A.2d 291; *see Karmand v. Karmand,* 145 Md.App. 317, 327–30, 802 A.2d 1106 (2002); *Roginsky v. Roginsky,* 129 Md.App. 132, 142, 740 A.2d 125 (1999), *cert. denied,* 358 Md. 164, 747 A.2d 645 (2000). "Rehabilitative alimony is intended to ease the transition from dependence to self-support," *Turner,* 147 Md.App. at 387, 809 A.2d 18, and is consistent with the "policy of this State . . . to limit alimony, where appropriate, to a definite term in order to provide each party with an incentive to become fully self-supporting." *Jensen v. Jensen,* 103 Md.App. 678, 692, 654 A.2d 914 (1995); *see Rock v. Rock,* 86 Md.App. 598, 608, 587 A.2d 1133 (1991); *Blake v. Blake,* 81 Md.App. 712, 727, 569 A.2d 724 (1990).

Family Law § 11–106(b) sets forth the factors that the trial court must consider in making an award of alimony. *See Innerbichler,* 132 Md.App. at 245, 752 A.2d 291. But, "the court 'need not use formulaic language or articulate every reason for its decision with respect to each factor. Rather, the court must clearly indicate that it has considered all the factors.' " *Digges,* 126 Md.App. at 387, 730 A.2d 202 (citations omitted); *see Doser v. Doser,* 106 Md.App. 329, 355–56, 664 A.2d 453 (1995). The statutory factors in F.L. § 11–106(b) are:

(b) *Required considerations.*—In making the determination, the court shall consider all the factors necessary for a fair and equitable award, including:

(1) the ability of the party seeking alimony to be wholly or partially self-supporting;

(2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(3) the standard of living that the parties established during their marriage;

(4) the duration of the marriage;

(5) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties; and

(11) the financial needs and financial resources of each party, including:

(i) all income and assets, including property that does not produce income;

(ii) any [monetary] award made ...;

(iii) the nature and amount of the financial obligations of each party; and

(iv) the right of each party to receive retirement benefits....

At trial, appellee testified that she was working about fifteen hours a week in her father's medical office, earning approximately $1,950 per month. Appellant, on the other hand, was receiving $10,000 in tax free disability payments. Appellee claimed expenses of over $13,000 per month for herself and Sam. In particular, she attributed $5,519.08 in expenses to herself. Appellee's single biggest expense item was the $6,257 in medical expenses allotted for Sam and herself. Although appellee testified that she and Sam were living with her parents, she stated that she paid rent to her parents and hoped to find a place of her own.

Appellant claimed $16,934 in total monthly expenses for himself and Sam, of which $12,038 was attributed solely to him. A large part of this sum, $3,430, was attributed to his primary residence, which included the mortgage and $600 for a housekeeper. He also listed the following other monthly expenses:

| | |
|---|---|
| Other Household Necessities | 495.00 |
| Medical/Dental | 1,602.00 |
| School Expenses | 2,398.00 |
| Recreation & Entertainment | 677.50 |
| Transportation Expense | 1,186.00 |
| Clothing | 250.00 |
| Micellaneous [sic] | 2,000.00 |

The miscellaneous expense pertained to the earlier Alimony/Child Support Consent Order.

The court noted that while the parties had enjoyed a high standard of living, appellee had never earned more than $30,000 per year. Moreover, as we indicated earlier in our discussion of child support, the court clearly believed that it will take appellee time to enter the job market, because she had "deferred" her career to care for appellant and Sam. Thus, it granted appellee "a reasonable period of time to reenter the job market," and awarded her monthly alimony of $3,500 for five years.

██ With regard to the duration of the rehabilitative alimony awarded to appellee, we perceive neither error nor abuse. We are unaware of any case that expressly prohibits the award of rehabilitative alimony for a period of time that exceeds the length of the marriage. Indeed, if the legislature wanted to enact a provision barring such an award on that basis, it would have done so. The logic of appellant's position would mean that, if parties are married, *arguendo*, for twenty years, but have a life expectancy of twenty-five years, a court should not award indefinite alimony, because they might ultimately be married for a period less than the number of years covered by the award of indefinite alimony. That is not the law.

Several other factors suggest that the court did not abuse its discretion in awarding rehabilitative alimony for five years. Appellee is the primary custodial parent of the parties' disabled child. Moreover, appellee never passed the bar exam, despite two attempts, and abandoned her legal career before she married appellant. Clearly, she cannot immediately begin to practice law. Nor should she be required, at this juncture,

to pursue a legal career any more than appellant should be forced to remain a practicing physician.

With regard to the *amount* of the alimony award, however, we cannot say, on this record, whether the award was appropriate. As we indicated in our child support discussion, the court determined that appellant is voluntarily impoverished because he is capable of earning more than the $10,000 per month he receives in non-taxable disability insurance benefits. That finding, which we have found erroneous, may have influenced the court in its calculation as to the appropriate amount of alimony.

In addition, as we suggested previously, there may well be a legitimate basis for appellee's decision to limit her work outside the home to fifteen hours per week. But, the record does not make clear why, at the present time, it is necessary for appellee to do so. Nor is it clear why the court considered it reasonable for appellee to limit herself as she did. Yet, in determining the amount of the alimony award, the court clearly based its decision on the finding that appellee works only fifteen hours a week, earning $1,950 a month.

For the reasons set forth in our child support discussion concerning appellee's income and the finding that appellant is voluntarily impoverished, we shall vacate the amount of the alimony award and remand for further consideration. On remand, the court should determine, *inter alia,* the amount of appellant's income, adjusted to reflect that his income is non-taxable. The court should also consider the extent to which appellee has the capacity to work more than fifteen hours a week and, if so, it should determine appellee's potential income and impute that additional income to her. We emphasize, however, that our opinion should not be construed as a determination that the amount of $3,500 in alimony is necessarily incorrect; we express no opinion as to the appropriate alimony award. Instead, our concern is with the findings on which the calculation was based.

## IV.

 The court ordered appellant to pay appellee "alimony of $3,500 per month, *non-taxable* to her. . . ." Appellant argues that the court exceeded its authority in designating appellee's alimony award as non-taxable. He asserts that the "trial court's award of a non-taxable $3,500 monthly payment to Wife is not alimony"; such an award is "fatally defective" because the law does not recognize such an award.

Appellee disputes appellant's "assertion that the court below created a new type of alimony." In her view, alimony was properly awarded pursuant to F.L. § 11–106. Moreover, she contends that the court "is empowered to designate alimony as not includable [sic] in gross income for tax purposes," pursuant to Internal Revenue Code, 26 U.S.C. § 71.

Internal Revenue Code, 26 U.S.C. § 71 provides, in part:

**§ 71. Alimony and separate maintenance payments.**

**(a) General rule.** Gross income includes amounts received as alimony or separate maintenance payments.

**(b) Alimony or separate maintenance payments defined.** For purposes of this section—

(1) In general. The term "alimony or separate maintenance payment" means any payment in cash if—

(A) such payment is received by (or on behalf of) a spouse under a divorce or separation instrument,

(B) the divorce or separation instrument does not designate such payment as a payment which is not includible in gross income under this section and not allowable as a deduction under section 215 . . .

Internal Revenue Code, 26 U.S.C. § 215 is also relevant. It states, in part:

**§ 215. Alimony, etc., payments.**

**(a) General rule.** In the case of an individual, there shall be allowed as a deduction an amount equal to the alimony or separate maintenance payments paid during such individual's taxable year.

**(b) Alimony or separate maintenance payments defined.** For the purposes of this section, the term "alimony or separate maintenance payment" means any alimony or separate maintenance payment (as defined in section 71(b)) which is includible in the gross income of the recipient under section 71.

In the ordinary course, alimony payments are included as "gross income" to the payee and are deductible by the payor for federal income tax purposes. *See* Internal Revenue Code, 26 U.S.C. §§ 71; 215(a); *see also Lewis v. Lewis,* 256 Md. 45, 53, 259 A.2d 246 (1969)(noting that alimony is "deductible in the computation of net income for federal tax purposes...."); *Groves v. Alexander,* 255 Md. 715, 719 n. 2, 259 A.2d 285 (1969)("Sections 71 and 215 [of the Internal Revenue Code] speak of payments by the husband to the wife and of the deductibility by the husband and includibility in the income of the wife.").

In this case, the court explicitly designated the payment of $3,500 per month as "alimony." If the payment is designated as "alimony," it constitutes "gross income." Under that circumstance, it is error to designate the receipt of alimony as tax-free to appellee and taxable to appellant.

### V. and VI.

Appellant contends that the court exceeded its authority in ordering the parties to establish a $60,000 trust account for the child's future medical needs. While recognizing the court's "authority to order the payment of actual or existing medical ... expenses," appellant argues that "this may not be read to grant the court authority to set up a trust fund for a child's future speculative potential expenses and force the parties to fund that account."

Moreover, appellant contends that any calculation of the parties' respective financial obligations to fund the account must consider the alimony obligation. He complains that the court incorrectly required him to contribute 84% of the money because it did not deduct from his income the alimony pay-

ment, nor add the alimony to the wife's income. Thus, appellant states: "Even if the court had the authority to order the creation and funding of an account for future medical and educational expenses of the parties' child, the court incorrectly determined the amount to be placed in that account by each parent."

As appellee points out, it was appellant who asked the court to establish a separate fund, exclusive of the child support award, to pay for their son's varying needs. Appellee asks rhetorically: "How can the husband now appeal and assign error to the judge for doing what he asked him to do?"

Appellee also argues that the court was not limited in how it allocated the cost of the child's medical expenses, because this was an above Guidelines case. Asserting that the court "can use its discretion when ordering payments on behalf of a minor child," she maintains that the court was not required to use a "direct proportion to income division" for their child's expenses.

In the court below, appellant's attorney argued:

If Your Honor could sequester that money for Sam to pay his benefits, that's almost a year's full of benefits.

What we're concerned about, and Your Honor heard me in one of our bench conferences, is that these [sic] is a child whose needs vary and continue to vary, and our view is that they do not and should not continue to increase.

And we would ask Your Honor to consider a child support award—basic child support award that is separate from the very special needs of Sam, but if Your Honor feels under the sequestration rule that he could sequester an amount of the property of about 50, or even 60 thousand dollars, sequester it, and here's how I would suggest Your Honor do it.

If Your Honor finds that there is approximately—based in equity, even if the entire escrow account is found by you to be marital property, you can still grant the monetary award to [appellant] in the amount of 50 to 60 thousand dollars.

Then you can enter a sequestration order against that money to have it paid subject to an order or request for the expenses of the child going forward, and along with that enter a basic child support amount for prospective child support, and then we can take a second look if the parties cannot agree on what the child support ought to be based on Sam's needs as they develop, say in a year's period of time.

 The plain and unambiguous language of F.L. § 12–204(b) authorizes the court to supplement the child support obligation under the Guidelines for certain categories of expenses, including extraordinary medical expenses. *Horsley*, 132 Md.App. at 26, 750 A.2d 692. As we said in *Horsley*: "By statute, the judge *shall* add to the basic child support obligation any ... extraordinary medical expenses, pursuant to F.L. § 12–204(h)." *Id*. at 23, 750 A.2d 692 (emphasis in original). Similarly, in *Miller v. Miller*, 142 Md.App. 239, 250, 788 A.2d 717, *aff'd sub nom. Goldberg v. Miller*, 371 Md. 591, 810 A.2d 947 (2002), we stated: "A parent's basic financial obligations may be increased ... to cover certain specifically enumerated expenses, such as 'child care expenses,' *see* F.L. § 12–204(g), 'extraordinary medical expenses,' *see* F.L. § 12–204(h), and 'school and transportation expenses' *see* F.L. § 12–204(i)."

"Extraordinary medical expenses" are defined as "uninsured medical expenses over $100 for a single illness or condition," and include "uninsured, reasonable, and necessary costs for ... treatment for any chronic health problem...." F.L. § 12–201(h)(1) and § 12–201(h)(2).

Additionally, the provision for school expenses is found in F.L. § 12–204(i). It provides, in pertinent part:

(i) *School and transportation expenses.*—By agreement of the parties or by order of the court, the following expenses incurred on behalf of the child may be divided between the parents in proportion to their adjusted actual incomes:

(1) any expenses for attending a special or private elementary or secondary school to meet the particular education needs of the child

 It is undisputed that Sam has significant needs. At a minimum, appellant recognized that the child's expenses amount to $40,000 a year, while appellee estimated that the cost exceeds $60,000. Appellant thus asked the court to augment the fund that the parties had already established for Samuel, rather than require him to pay more in monthly child support. The court agreed that this was "the most appropriate way" to provide for Sam's extraordinary medical expenses. Therefore, it required the parties to add $60,000 to the medical fund that the parties had already set up. In that way, the money would be available to meet the child's expenses as they accrued.

As we see it, the trial court merely acceded to appellant's suggestion in regard to the "medical fund" for Sam's extraordinary expenses. Appellant has not provided us with any authority to indicate that the court had no authority to honor his request. Therefore, we decline to consider whether, as a court of equity, the court had inherent powers to sequester such funds for the child's medical expenses.

 However, we agree with appellant that the parties' contributions to the fund should be made in proportion to their respective incomes. In general, the "expenses incurred on behalf of a child shall ... be divided between the parents in proportion to their adjusted actual incomes." F.L. § 12–204(h); see Horsley, 132 Md.App. at 23–24, 750 A.2d 692; Payne v. Payne, 132 Md.App. 432, 441, 752 A.2d 1209 (2000); Boswell v. Boswell, 118 Md.App. 1, 34–35, 701 A.2d 1153 (1997), aff'd, 352 Md. 204, 721 A.2d 662 (1998). Pursuant to F.L. § 12–201(c)(3)(xiv), actual income includes "alimony or maintenance received." Moreover, under F.L. § 12–201(d)(2), "Adjusted actual income" means "actual income minus ... alimony or maintenance obligations actually paid," except as provided in F.L. § 12–204(a)(2).

The court stated: "The Court finds that the therapeutic expenses for the child shall be paid in proportion to the parties' income." Nevertheless, while the court apparently intended to divide the expenses in accordance with each parent's income, and stated that, as to future expenses, "the parties shall continue to share these expenses on a percentage basis," it failed to take into account the award of alimony to appellee as part of her "actual income." As a result, the court ordered the parties to pay for the child's medical fund based upon the finding that their "total" combined income was $12,000 per month, of which $10,000 was attributed to appellant and $2,000 was attributed to appellee. Put another way, the court ordered appellant to contribute $50,400 to the fund, and directed appellee to contribute only $9,600.

Because "[a]limony must be considered when determining each parent's monthly adjusted actual income," *Scott v. Scott,* 103 Md.App. 500, 521, 653 A.2d 1017 (1995), we shall direct the court, on remand, to revise the allocation of the parties' respective contributions to the medical fund by taking into account the amount of any alimony paid by appellant to appellee.

## VIII.

Appellant challenges the court's ruling as to the monetary award. Because of our disposition of the alimony award, however, we must vacate the monetary award for a new evaluation. *See, e.g., Alston v. Alston,* 331 Md. 496, 509, 629 A.2d 70 (1993) (remanding alimony issue upon reversal of monetary award); *Randolph v. Randolph,* 67 Md.App. 577, 589–90, 508 A.2d 996 (1986) (vacating counsel fees award upon reversal of monetary award); *Rosenberg v. Rosenberg,* 64 Md.App. 487, 537, 497 A.2d 485, *cert. denied,* 305 Md. 107, 501 A.2d 845 (1985) (vacating alimony award for reconsideration because monetary award was vacated). This is because the factors underlying alimony, a monetary award, and counsel fees are "so interrelated that, when a trial court considers a claim for any one of them, it must weigh the award of any

other." *Turner,* 147 Md.App. at 400, 809 A.2d 18; *see Doser,* 106 Md.App. at 335 n. 1, 664 A.2d 453; *Strauss v. Strauss,* 101 Md.App. 490, 511, 647 A.2d 818 (1994), *cert. denied,* 337 Md. 90, 651 A.2d 855 (1995). Nevertheless, for the guidance of the court and the parties on remand, we shall address the issue of the monetary award.

The court ordered the parties to divide evenly the money in the escrow account containing the proceeds from the sale of the marital home. However, the court declined to grant a monetary award to appellant. He asserts that the "failure to grant a monetary award can be seen as most unfair by examining the financial position of the parties at the time of marriage and at divorce." In particular, he focuses on the $196,709.48 that he withdrew from his non-marital retirement accounts to use for the purchase of the marital home. Further, he states:

At the time of the marriage Husband had approximately $400,000 in assets. These monies were used for marital purposes. They are now all gone. Husband is left with essentially no assets. What he is left with is a tax obligation of $100,000 plus other debts. Wife, who entered this three-year marriage with essentially no assets, now has her IRA of $21,000 acquired during the marriage, an expensive car, a $20,000 Country Club membership and half the proceeds of sale from the family home, which are largely traceable to infusion of Husband's non-marital assets, plus $114,000 from Husband's share of the house [he owned before the marriage].

In addition, appellant observes that his share of the escrow account is his only source of payment for the judgment entered against him for $60,000 in regard to appellee's attorneys' fees, and the $50,400 that the court ordered him to contribute to the escrow account established for the child's future medical expenses. Therefore, he claims that, in effect, he will be left with nothing.

Appellee concedes that the couple used appellant's non-marital funds towards the purchase of the marital home.

However, she claims the court was not required to credit appellant with that money. Moreover, she notes that, since January 2000, appellant dissipated about $206,000 of the monies remaining in the retirement accounts titled to him.

The term "marital property" refers to property acquired by one or both parties during the marriage, regardless of how the property is titled. F.L. § 8–201(e)(1). *See Golden v. Golden,* 116 Md.App. 190, 202, 695 A.2d 1231, *cert. denied,* 347 Md. 681, 702 A.2d 290 (1997). In 1994, the definition of "marital property" in F.L. § 8–201(e) was expanded to include "any interest in real property held by the parties as tenants by the entirety unless the real property is excluded by valid agreement." F.L. § 8–201(e)(2); *see* John F. Fader, et al., *Maryland Family Law,* § 15–7(h), at 15–38 (3d ed.2000).

However, under F.L. § 8–201(e)(3), property is not marital if it was:

(i) acquired before the marriage;

(ii) acquired by inheritance or gift from a third party;

(iii) excluded by valid agreement; or

(iv) directly traceable to any of these sources.

*See Otley v. Otley,* 147 Md.App. 540, 547, 810 A.2d 1 (2002).

"The purpose of the monetary award is to correct any inequity created by the way in which property acquired during the marriage happened to be titled." *Doser,* 106 Md.App. at 349, 664 A.2d 453; *see Long v. Long,* 129 Md.App. 554, 579, 743 A.2d 281 (2000); *Strauss,* 101 Md.App. at 501, 647 A.2d 818. In *Ward v. Ward,* 52 Md.App. 336, 339–40, 449 A.2d 443 (1982) (citation omitted), the Court explained:

The monetary award is thus an addition to and not a substitution for legal division of the property accumulated during marriage, according to title. It is "intended to compensate a spouse who holds title to less than an equitable portion of that property . . . ." What triggers operation of the statute is the claim that a *division* of the parties' property according to its title would create an inequity which would be overcome through a monetary award.

 When a party petitions for a monetary award, the trial court must follow a three-step procedure. F.L. §§ 8–203, 8–204, 8–205; *see Ware*, 131 Md.App. at 213, 748 A.2d 1031; *Caccamise*, 130 Md.App. at 515, 747 A.2d 221; *Doser*, 106 Md.App. at 349–50, 664 A.2d 453. Family Law §§ 8–203 to 8–205 set out the requisite statutory scheme that applies to a monetary award. As we explained in *Innerbichler*, 132 Md. App. at 228, 752 A.2d 291:

> First, for each disputed item of property, the court must determine whether it is marital or non-marital. F.L. §§ 8–201(e)(1); 8–203. Second, the court must determine the value of all marital property. F.L. § 8–204. Third, the court must decide if the division of marital property according to title will be unfair; if so, the court *may* make an award to rectify any inequity.... F.L. § 8–205(a).

 The party who claims a marital interest in property has the burden of proof as to that claim. *Newborn v. Newborn*, 133 Md.App. 64, 94, 754 A.2d 476 (2000); *Odunukwe v. Odunukwe*, 98 Md.App. 273, 282, 633 A.2d 418 (1993). Conversely, a party seeking to demonstrate the nonmarital nature of a particular property must "trace the property to a nonmarital source." *Noffsinger v. Noffsinger*, 95 Md.App. 265, 282, 620 A.2d 415, *cert. denied*, 331 Md. 197, 627 A.2d 539 (1993); *see Innerbichler*, 132 Md.App. at 227, 752 A.2d 291; *Golden*, 116 Md.App. at 205, 695 A.2d 1231. Ordinarily, the matter of whether property is marital or non-marital is a question of fact. Therefore, our review of a trial court's decision as to that issue is governed by the clearly erroneous standard. *Noffsinger*, 95 Md.App. at 285, 620 A.2d 415; Md. Rule 8–131.

Family Law § 8–205 sets forth the relevant factors that the court must consider in regard to a monetary award. *Lemley v. Lemley*, 102 Md.App. 266, 294–95, 649 A.2d 1119 (1994), *cert. denied.*, 344 Md. 567, 688 A.2d 446, *cert. denied*, 522 U.S. 970, 118 S.Ct. 420, 139 L.Ed.2d 322 (1997). Family Law § 8–205(b) provides:

(b) *Factors in determining amount and method of payment or terms of transfer.*—The court shall determine the amount and the method of payment of a monetary award, or the terms of the transfer of the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both, after considering each of the following factors:

(1) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(2) the value of all the property interests of each party;

(3) the economic circumstances of each party at the time the award is to be made;

(4) the circumstances that contributed to the estrangement of the parties;

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) how and when specific marital property was acquired, including the effort expended by each party in accumulating the marital property;

(9) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(10) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award.

■■■■■■■ Although consideration of the factors is mandatory, *Doser,* 106 Md.App. at 351, 664 A.2d 453, the trial court need not "go through a detailed check list of the statutory factors, specifically referring to each, however beneficial such a procedure might be...." *Grant v. Zich,* 53 Md.App. 610, 618, 456 A.2d 75 (1983), *aff'd,* 300 Md. 256, 477 A.2d 1163 (1984); *see Doser,* 106 Md.App. at 351, 664 A.2d 453. This is because a judge is presumed to know the law, and is not required to "enunciate every factor he considered on the record," as long as he or she states that the statutory factors were considered. *Randolph,* 67 Md.App. at 585, 508 A.2d 996.

But, "the chancellor who fails to provide at least some of the steps in his thought process leaves himself open to the contention that he did not in fact consider the required factors." *Campolattaro v. Campolattaro,* 66 Md.App. 68, 81, 502 A.2d 1068 (1986); *see Lemley,* 102 Md.App. at 295, 649 A.2d 1119.

It is well settled that the trial court has broad discretion in determining whether to grant a monetary award and, if so, in what amount. *Chimes,* 131 Md.App. at 282–83, 748 A.2d 1065; *see Alston,* 331 Md. at 504, 629 A.2d 70; *Ware,* 131 Md.App. at 214, 748 A.2d 1031; *Doser,* 106 Md.App. at 350, 664 A.2d 453; *Grant,* 53 Md.App. at 614, 456 A.2d 75. "This means that we may not substitute our judgment for that of the fact finder, even if we might have reached a different result." *Innerbichler,* 132 Md.App. at 230, 752 A.2d 291. Indeed, the decision whether to grant a monetary award will not be overturned unless the judgment is clearly erroneous and due regard will be given to the trial judge's opportunity to judge the credibility of the witnesses. *See Gallagher v. Gallagher,* 118 Md.App. 567, 579–80, 703 A.2d 850 (1997), *cert. denied sub nom. Gallagher v. Levine,* 349 Md. 495, 709 A.2d 139 (1998).

In *Alston,* 331 Md. at 508, 629 A.2d 70, the Court of Appeals cautioned against "succumb[ing] to the temptation to divide the [marital] property equally . . . our statute requires 'equitable' division of marital property, not 'equal' division." Indeed, "no hard and fast rule can be laid down, and . . . each case must depend upon its own circumstances to insure that equity be accomplished. . . ." *Id.* at 507, 629 A.2d 70. Nevertheless, the trial court must exercise its discretion in accordance with correct legal standards. *Alston,* 331 Md. at 504, 629 A.2d 70; *Freese v. Freese,* 89 Md.App. 144, 153, 597 A.2d 1007 (1991), *cert. denied,* 325 Md. 396, 601 A.2d 129 (1992).

In the case *sub judice,* it is evident that the trial court followed the requisite three-step process before deciding whether to grant a monetary award. The court described this process in its written opinion, stating:

In determining an equitable distribution of marital property, courts are required to engage in a three-step process. First, all property owned by the parties must be categorized as either marital or non-marital property. Second, the marital property must be valued. Finally, the court may make a monetary award.

The court then divided the parties' property into marital and non-marital categories. The parties disagreed as to five items of property: 1) the escrow account containing proceeds from the sale of the marital home; 2) the Oppenheimer SEP retirement account; 3) Dr. Malin's 401K; 4) appellee's wedding ring; and 5) Dr. Malin's disability insurance payments. As to these five items, the court found that the escrow account contained $269,700, and was partially marital property and partially non-marital property; the Oppenheimer SEP IRA was marital property with a value of $4,920; the 401K was marital property with a valuation of zero; appellee's wedding ring was non-marital property; and appellant's disability insurance payments are non-marital property.

Further, the court determined that appellant "contributed $231,000 to the acquisition of the house from funds acquired before the marriage." Yet, the court also recognized that appellee made significant and valuable non-monetary contributions that benefitted the family. Further, the court found that appellant dissipated nearly $206,000 since January of 2000.

We pause to observe that appellant has not challenged the finding of dissipation. Indeed, he does not discuss the matter in his opening brief and, in his reply brief, he merely states: "Although the word 'dissipation' is used by the trial court, evidence only shows that husband used funds, many of which were his non-marital funds, for the purposes of paying income taxes, living expenses, and attorney's fees." Therefore, we need not decide whether the court erred in finding dissipation, and we may consider the court's finding of dissipation in analyzing its decision in regard to a monetary award.

In declining to grant a monetary award, the court was keenly aware that, since January 2000, appellant liquidated

the money in several Oppenheimer retirement accounts, containing over $200,000. In this regard, the court said:

> Now, let me just momentarily go back to one concern that I had with respect to the resources of the parties in this case: There was a substantial amount of funds in this case between these parties that I am sure went someplace and could not be accounted for, but it wasn't, and there was no fudging or attempt to explain it other than it was used probably just [for] living, and Dr. Malin was unable to account for that.

Moreover, the trial court expressly stated that, "aside from the Front Field Escrow account [i.e., the marital home], there are not sufficient assets remaining between the parties to provide for a monetary award." That finding was not clearly erroneous.

The court also ordered the parties to divide equally the "proceeds from the sale of the house that was titled as tenants by the entireties and is currently held in the escrow account." The marital home was titled as tenants by the entireties. Therefore, the proceeds of sale in the escrow account were entirely marital property, notwithstanding any comment by the court to the contrary.

In *Karmand*, 145 Md.App. at 341, 802 A.2d 1106, this Court said:

> [U]nder FL section 8–201(e)(2), the parties' Potomac house was entirely marital property, irrespective of whether non-marital funds were applied to its purchase (so long as it was not excluded by valid agreement, which it was not). FL section 8–201(e)(3), which provides, *inter alia*, that property is not "marital property" when it was acquired before the marriage, acquired by inheritance or gift from a third party, or is directly traceable to any of these sources, does not apply to paragraph 2 of the subsection. Thus, the source of funds theory does not apply to an interest in real property held by the parties as tenants by the entireties. Accordingly, the fact that the appellant used non-marital funds in the

purchase of the parties' Potomac house could not mean that a portion of that property was non-marital.

To be sure, the court recognized that some of appellant's non-marital funds were used to acquire the marital home. Thus, the court could have recognized, by way of a monetary award, that the marital home was acquired, in part, with non-marital funds. Family Law § 8–205(b)(11) permits the court to consider "any other factor" that is pertinent "to arrive at a fair and equitable monetary award...." But, the court was not compelled to do so.

Under all of the facts and circumstances of this case, including the financial status of the parties, appellant's dissipation of the retirement accounts, his loss of a lucrative job due to alcohol and drug abuse, and his arrest, the court did not err or abuse its discretion in declining to recognize appellant's non-marital contribution to the purchase of the marital home by way of a monetary award.

## IX.

The court ordered appellant to pay a portion of appellee's attorneys' fees, in the amount of $60,000, and the court reduced that ruling to a judgment. As to the issue of "substantial justification for prosecuting or defending the proceeding," the court wrote:

It is abundantly clear that [appellant's] drug addiction, arrest, and treatment debilitated the parties' marriage like a "carcinogenic cell". The pain, mistrust, and disappointment became so acute as to have a terminal effect on this marriage. [A]ppellee's contribution to the estrangement of the parties was benign, comparatively speaking.

Because the issues of alimony, child support, and the monetary award must be resolved on remand, we shall also vacate the award of counsel fees. In *Doser, supra,* 106 Md.App. at 335 n. 1, 664 A.2d 453, we noted that the factors underlying an award of counsel fees, alimony, and a monetary award are so interrelated that a re-consideration as to one award requires a new evaluation of the others. *See Turner,* 147 Md.App. at

413, 809 A.2d 18 (after vacating alimony award, court vacated award of attorney's fees, "so that the court may consider the issue of attorney's fees based on accurate factual underpinnings."); *Freedenburg v. Freedenburg,* 123 Md.App. 729, 742, 720 A.2d 948 (1998); *Strauss,* 101 Md.App. at 511, 647 A.2d 818. Nevertheless, we shall briefly address the issue for the benefit of the court and the parties on remand.

Appellant contends that the court abused its discretion in awarding appellee $60,000 in attorney's fees because it did not consider the "financial condition of each party, the needs of each party, and the justification for bringing or defending the proceeding." He argues that the award of such fees was done "without explanation" and were "excessive." Further, he states: "The amount of attorneys' fees on both sides far exceeded the amount in controversy." Appellant also claims that an award of fees is "especially unfair" in light of the fact that all his money is virtually gone or will soon be depleted.

Appellee points out that the court's oral opinion evidences that it took into consideration the issues raised by the parties, the "financial resources and needs of each party and the justification for bringing or defending the action," as it was required to do. Moreover, she notes that the court awarded her less than 60% of her actual legal fees.

Attorney's fees are governed by F.L. § 11–110. This section provides, in pertinent part:

(b) *Authority of court.*—At any point in a proceeding under this title, the court may order either party to pay to the other party an amount for the reasonable and necessary expense of prosecuting or defending the proceeding.

(c) *Required considerations.*—Before ordering the payment, the court shall consider:

(1) the financial resources and financial needs of both parties; and

(2) whether there was substantial justification for prosecuting or defending the proceeding.

*See Turner,* 147 Md.App. at 412–13, 809 A.2d 18.

Attorney's fees may also be awarded in child custody or support cases pursuant to F.L. § 12–103. It provides, in part:

(a) *In general.*—The court may award to either party the costs and counsel fees that are just and proper under all the circumstances in any case which a person:

(1) applies for a decree or modification of a decree concerning the custody, support, or visitation of a child of the parties; or

(2) files any form of proceeding:

(i) to recover arrearages of child support;

(ii) to enforce a decree of child support; or

(iii) to enforce a decree of custody or visitation.

Numerous factors must be considered before awarding counsel fees, including: "(1) the financial status of each party; (2) the needs of each party; and (3) whether there was a substantial justification for bringing, maintaining, or defending the proceeding." F.L. § 12–103(b); *see Dunlap,* 128 Md.App. at 374, 738 A.2d 312. Moreover, in *Lemley v. Lemley,* 109 Md.App. 620, 633, 675 A.2d 596 (1996), *cert. denied,* 344 Md. 567, 688 A.2d 446, *cert. denied,* 522 U.S. 970, 118 S.Ct. 420, 139 L.Ed.2d 322 (1997), we said that, "[u]nder either provision [F.L. § 11–110 or F.L. § 12–103], the chancellor must undertake the same investigation before making an award of attorney's fees." Failure of the court to consider the statutory criteria constitutes legal error. *Carroll County v. Edelmann,* 320 Md. 150, 177, 577 A.2d 14 (1990)(recognizing that, pursuant to F.L. § 12–103(b), the court is required "to consider the financial status of the parties, the needs of the parties, and whether there was substantial justification for bringing or defending the proceeding" when awarding counsel fees).

Nevertheless, the trial court "is vested with wide discretion" in deciding whether to award counsel fees and, if

so, in what amount. *Dunlap,* 128 Md.App. at 374, 738 A.2d 312; *see Petrini,* 336 Md. at 468, 648 A.2d 1016. Although that discretion is subject to appellate review, we will not disturb an award unless the exercise of discretion was arbitrary or the judgment was clearly wrong. *Broseus v. Broseus,* 82 Md.App. 183, 200, 570 A.2d 874 (1990); *see Doser,* 106 Md.App. at 359, 664 A.2d 453 ("The award or denial of counsel fees is governed by the abuse of discretion standard."); *Davis v. Davis,* 97 Md.App. 1, 25, 627 A.2d 17 (1993), *aff'd* 335 Md. 699, 646 A.2d 365 (1994); *Coviello v. Coviello,* 91 Md.App. 638, 658, 605 A.2d 661 (1992).

In our view, Dr. Malin is wrong when he states: "Without explanation, or apparent consideration of the parties' financial situation, the court ordered Husband to pay to wife $60,000 towards her attorney's fees." It is evident from the record that the court considered the financial situation of both parties before coming to any determination as to legal fees.

**JUDGMENT AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**